**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESS FRONTIER LLC,<br><br>Plaintiff,<br><br>-against-<br><br>OSTIUM FOUNDATION; OSTIUM LABS CO.; DELTAX LTD.; DX GROUP LIMITED; KALEDORA KIERNAN-LINN; and JOHN DOE TRANSFEREES 1-10,<br><br>Defendants. | **Case No.** 26-7645<br><br>COMPLAINT FOR PROVISIONAL RELIEF IN AID OF ARBITRATION<br><br>JURY TRIAL DEMANDED |

Plaintiff ESS FRONTIER LLC ("Plaintiff"), by its undersigned attorneys, alleges as follows against Ostium Foundation (the "Foundation"), Ostium Labs Co. ("Ostium Labs"), DeltaX Ltd. ("DeltaX"), DX Group Limited ("DX Group"), Kaledora Kiernan-Linn ("Kiernan-Linn"), and John Doe Transferees 1–10 (the "Doe Transferees," and collectively, "Defendants"):

## INTRODUCTION

1. Without immediate court action, more than $15 million subject to a clear-cut New York arbitration agreement will be spent, transferred, or beyond reach before the arbitrators can act.

2. This case involves a straightforward loan. The Lender[1] advanced 20 million units of a cryptocurrency called USDC to the Foundation under two written loan agreements. The Foundation returned 5 million USDC, acknowledged the remaining debt, and then defaulted after Lender recalled both loans. Plaintiff now owns the loans and the related claims and is commencing

[1] The Lender has assigned their claims to Plaintiff. This Complaint uses Lender to refer to the signatory on the loan agreements. Plaintiff stands in the shoes of Lender and, for ease of reference, is also used to refer to Lender's historical interactions as well as the present rights holder.

an AAA arbitration in New York County to recover at least 15 million USDC, plus contractual fees, interest, and costs.

3. Defendants run a high-risk decentralized-finance platform through New York. When pitching her project to Lender, Kiernan-Linn represented that Ostium maintained enterprise funds and bank and trading accounts in New York. Those accounts hold liquidity used in Ostium's leveraged crypto and derivatives operations. Defendants have withheld the institutions, account numbers, booking locations, and current balances, and Plaintiff seeks expedited discovery to identify the New York property and garnishees subject to attachment.

4. Defendants suffered a catastrophic off-chain security failure after Lender and others entrusted them with tens of millions of dollars. An attacker compromised Ostium's off-chain pricing infrastructure and a privileged signer, then removed 23,752,746 USDC from Ostium's liquidity-provider vault. The same privileged systems Ostium used to run the hedge and move liquidity failed.

5. After that failure, Defendants did not secure Lender's matured debt or stop the risk to his repayment. They kept the platform's high-risk operations running, projected millions of dollars in additional spending, asked lenders to discount or exchange the debt, and refused to return the 15 million USDC due under a straightforward written contract.

6. Defendants operate as alter egos. The founders divided borrowing, operations, technology, hedging, intercompany claims, and cash among commonly controlled entities—including the Foundation, Ostium Labs, DeltaX, and DX Group—to shield the operating enterprise and its assets from creditor claims. Ostium Labs runs the business. DeltaX runs the supposed off-chain hedge. DX Group carries offsetting intercompany receivables and payables. When Lender

demanded payment, Defendants sent him back to the Foundation—the entity that owed the debt but reported deeply negative equity.

7. Ostium's own records expose the mismatch. They demonstrate that funds are flowing back and forth without regard to the nominal entity separation.[2]

8. The loans were induced by material misrepresentations of fact made by Defendants about the structure of Ostium. Before the loans, Kiernan-Linn and Ostium Labs represented to the Lender that Ostium's strategy was delta-neutral and that directional exposure would be hedged off-chain through institutional counterparties. Lender advanced 20 million USDC to the Foundation based on these representations, which turned out to be false. The principal hedging partner was DeltaX, which Plaintiff now knows is an Ostium affiliate created, owned, or controlled in material part by Ostium insiders. Ostium hid that related-party relationship. DeltaX was not an independent institutional counterparty. It was the same enterprise, wearing another name.

9. Plaintiff therefore seeks two forms of emergency relief under Federal Rule of Civil Procedure 64 and CPLR 7502(c). **First**, it seeks attachment against the Foundation's property and debts pending the New York arbitration. **Second**, it seeks targeted preservation, expedited discovery, and relief against affiliates and transferees that hold loan proceeds, traceable substitutes, voidable transfers, or enterprise assets moved to frustrate repayment.

10. The Court should act before Ostium's remaining liquid assets are spent, transferred, pledged, or lost and the promised New York arbitration becomes an empty exercise.

---

[2] Details of the commingling and asset moves are in the accompanying sealed portions of the petition for emergency relief and declarations, which Plaintiff incorporates into the Complaint.

**PARTIES**

11. Plaintiff ESS FRONTIER LLC is a Delaware limited liability company. On September 4, 2026, Lender assigned Plaintiff the two loans and all related contract, tort, arbitration, tracing, transfer, provisional-remedy, and enforcement claims asserted here.

12. Lender resides in Hong Kong. He was the original lender, made the advances, received the Foundation's partial repayment and acknowledgment, recalled both loans, and assigned his rights to Plaintiff.

13. The Foundation is a Cayman Islands foundation company with its principal place of business at Suite 3119, 9 Forum Lane, Camana Bay, George Town, Grand Cayman, KY1-9006. It is the named borrower under the loan documents and the nominal obligor on the 15 million USDC debt.

14. Ostium Labs is a Delaware corporation with a registered address at 251 Little Falls Drive, Wilmington, Delaware 19808. It developed and operates the Ostium platform and controls material personnel, technology, infrastructure, and enterprise value used by the Foundation.

15. DeltaX performs or participates in Ostium's off-chain hedging. Ostium's own materials treat DeltaX and the Foundation as a combined financial unit and propose DeltaX as a guarantor and collateral provider for Foundation debt.

16. DX Group is a related Ostium entity used in the enterprise's hedging and intercompany structure. Ostium produced DX Group's accounts together with the Foundation, Ostium Labs, and DeltaX accounts as part of the same lender process.

17. Kiernan-Linn co-founded Ostium with Marco Antonio Ribeiro and serves as Ostium Labs' chief executive officer. Section VII(e) of the Master Agreement defines a "Key Person Event" to include the event that Kiernan-Linn "ceases to be actively involved in or responsible for the management or investment decision making of Borrower." She personally

participated in the solicitation, representations, omissions, control, and creditor response alleged here.

18. The Doe Transferees received or control Foundation property, loan proceeds, enterprise cash, traceable substitutes, or other transfers subject to attachment, avoidance, preservation, or recovery. Their identities and roles will be alleged by name when Defendants' records and expedited discovery reveal them.

**JURISDICTION AND VENUE**

19. This Court has subject-matter jurisdiction under 9 U.S.C. § 203 because this action falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The loan agreement is commercial and non-domestic, involves a Hong Kong lender and a Cayman borrower, and requires final AAA arbitration in New York County.

20. Sections 203 and 206 of the Federal Arbitration Act authorize this Court to enforce the agreement and protect the New York arbitration. Federal Rule of Civil Procedure 64 makes New York attachment remedies available. CPLR 7502(c) authorizes attachment and preliminary injunctive relief where an arbitral award may otherwise be rendered ineffectual.

21. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the related fraud, negligence, transfer, alter-ego, and equitable claims. Those claims arise from the same loans, representations, security architecture, asset flows, and post-default conduct.

22. The Foundation agreed to New York law and final arbitration in New York County. Kiernan-Linn held transaction-related meetings with Lender in Brooklyn and Manhattan, directed communications and performance toward New York, and participated in selecting and implementing the New York-centered transaction.

23. When soliciting the loan, Kiernan-Linn told Lender directly that Ostium's enterprise funds and bank and trading accounts were maintained in New York. She later confirmed

in writing that Ostium held liquidity in "TradFi accounts." Plaintiff seeks attachment of property and debts subject to New York process and expedited discovery identifying the institutions, accounts, custodians, counterparties, and garnishees holding them.

24. Venue is proper under 9 U.S.C. § 204 because New York County is the contractually selected place of arbitration and the material New York contacts alleged above occurred in this District.

## FACTUAL BACKGROUND

### A. Ostium's Founders Build and Promote a High-Risk DeFi Platform

25. Kiernan-Linn and Ribeiro met in an economics class at Harvard. Ostium's own account emphasizes Kiernan-Linn's prior career as a professional ballerina with the Royal Danish Ballet and Ribeiro's international science-olympiad background. They later worked at Bridgewater Associates and built Ostium together.

26. Ostium Labs announced its first institutional financing in October 2023. General Catalyst and LocalGlobe co-led a $3.5 million round. Ostium described the platform as designed to minimize liquidity-provider directional risk and emphasized its fully on-chain settlement and matching.[3]

27. Ostium later promoted a much larger enterprise. In December 2025, between Lender's first and second advances, Ostium Labs announced $24 million in new capital—bringing its stated total funding to approximately $27.8 million—from investors including General Catalyst, Jump Crypto, Coinbase Ventures, Wintermute Ventures, and others.[4]

---

[3] Ostium Labs, "Ostium Labs raises $3.5M co-led by General Catalyst and LocalGlobe" (Oct. 6, 2023), https://www.ostium.com/blog/ostium-labs-raises?tag=Defi.

[4] Ostium Labs, "Ostium Labs raises $24M in new capital co-led by General Catalyst and Jump" (Dec. 3, 2025), https://www.ostium.com/blog/ostium-labs-raises-24m-co-led-by-general-catalyst-and-jump-crypto.

28. Ostium has repeatedly promoted its founders, investors, trading volume, open interest, fees, and claimed technological advantages.[5] By 2026, its own public materials advertised tens of billions of dollars in cumulative trading volume and leveraged exposure to crypto assets, commodities, foreign exchange, equities, and market indices.

29. Ostium's own figures and public blockchain activity showed a platform generating substantial fees and processing enormous volume. That is the enterprise Lender thought he was funding.

**B. DeFi Combines Public Blockchain Transactions With Privileged Control**

30. The alter ego defendants utilize novel cryptocurrency and decentralized finance concepts to create a web of entities that appears like a legitimate and innovative business but in reality is just an operation designed to extract money from victim lenders such as plaintiff.

31. A blockchain is a shared digital ledger. It records transfers in a sequential, cryptographically secured form that can ordinarily be viewed publicly even when the real-world identity controlling a wallet address is not public.

32. USDC is a digital asset designed to track the value of one United States dollar. The loans here were advanced and are repayable in USDC.

33. Decentralized-finance, or "DeFi," platforms use blockchain-based computer programs called smart contracts to provide trading, lending, and other financial functions. A smart contract executes programmed instructions and records the result on the blockchain.

34. DeFi does not eliminate human control. Developers, founders, privileged signers, price feeds, cloud infrastructure, custodians, exchanges, and off-chain accounts may control critical parts of the system.

---

[5] See Exhibit 2 (Ostium V2 launch announcement, March 27, 2025, promoting spreads, FX fees, and tradable markets).

35. That combination creates a recurring danger. Public smart-contract code can appear secure while an attacker compromises a privileged credential, off-chain server, price feed, or signer that the platform's operators control. Prior DeFi failures, including the Mango Markets exploit, made that danger concrete to Lender.

36. "On-chain" activity is recorded through blockchain transactions or smart contracts. "Off-chain" activity occurs outside that public settlement layer through private infrastructure, accounts, counterparties, or trading arrangements.

37. Ostium uses both. Its public protocol records positions and settlement through smart contracts on Arbitrum. But Ostium's directional flow, private hedging, pricing infrastructure, privileged signers, and TradFi accounts depend on systems and actors outside the public code.

### C. Ostium Markets Security, Segregation, and Off-Chain Hedging

38. Ostium cultivated confidence through public claims of transparency, self-custody, professional audits, institutional pricing, segregated pools, and hedging. After both loans were made, its June 2026 founder interview kept the same public theme: capital was divided into segregated pools and "all the flow is hedged."[6]

39. The apparent audits had a critical limitation. The 2024 and 2025 Zellic smart-contract assessments expressly excluded project infrastructure and key custody. Ostium's audit page, reviewed after the incident, likewise states that frontend code and off-chain hedging infrastructure were outside the audits' scope.[7]

---

[6] Boaz Sobrado, "The New Reality TV"—Whales Trade Oil, Gold and Nvidia on One Chain, Forbes (June 22, 2026), https://www.forbes.com/sites/boazsobrado/2026/06/22/the-new-reality-tv-whales-trade-oil-gold-and-nvidia-on-one-chain/.

[7] Ostium Documentation, "Smart Contract Audits," https://docs.ostium.com/protocol/security/audits; Zellic, Ostium security assessments dated Feb. 22, 2024 and Nov. 24, 2025.

40. Those exclusions left the precise systems that later failed—off-chain pricing infrastructure and a privileged signer—outside the smart-contract audit perimeter.

41. Lender understood the DeFi risk. He was willing to lend only because Ostium offered a structure that appeared to separate his capital from ordinary directional and protocol exposure.

42. Before the loans, Kiernan-Linn made specific statements about Ostium's existing resources and structure. On May 14, 2025, she wrote that Ostium had "enough capital to sustain immediate required hedging activity." Before the loans, she represented to the Lender that Ostium's strategy was delta-neutral and that directional exposure would be hedged off-chain through institutional counterparties.

43. Lender understood those words to mean that separately owned, adequately capitalized institutions would impose their own risk limits, collateral practices, pricing, settlement procedures, records, and incentives.

44. Lender would not have exposed 20 million USDC to Ostium on the same terms without the represented off-chain structure, independent counterparties, and existing ability to support the hedge.

**D. Kiernan-Linn Personally Solicits the Two Loans**

45. Kiernan-Linn cultivated the relationship through direct Telegram messages, calls, written proposals, and New York meetings. In May 2025 she invited Lender to Ostium's office at the Brass Factory in Williamsburg and met him there. On May 14, she told him Ostium was preparing to start its pilot hedging program and had "enough capital to sustain immediate required hedging activity." In October 2025 she personally reopened the private-capital discussion, arranged the solicitation call, and sent the proposal that led directly to the first loan.

46. On May 7, 2025, she sent Lender figures portraying Ostium as a fast-growing enterprise. She reported annualized fees of approximately $23.81 million and annualized trading volume of approximately $57.77 billion and supplied links to public data.

47. On May 14, 2025, she described a pilot hedging program and stated that Ostium had "enough capital to sustain immediate required hedging activity." That was a statement about Ostium's existing resources and capacity.

48. On October 15, 2025, Kiernan-Linn told Lender by Telegram that Ostium was "opening up a few million for a couple investors," asked to speak that week, and joined a call with Lender and his cofounder that day. On October 16, she sent the transaction proposal and offered to add relevant Ostium personnel to Lender's group chat.

49. Before the loans, Kiernan-Linn and Ostium represented to the Lender that Ostium's strategy was delta-neutral and that directional exposure would be hedged off-chain through institutional counterparties. Kiernan-Linn spoke as Ostium's founder and chief executive and as the person the Foundation's Master Agreement later identified as its "Key Person."

50. Kiernan-Linn also met Lender twice in New York—once in Brooklyn and once in Manhattan—in connection with the same relationship and course of dealing.

51. On October 20, 2025, Lender and the Foundation executed a Master Digital Currency Loan Agreement (the "Master Agreement") and a Loan Term Sheet (the "First Term Sheet"). Lender then advanced 10,000,000 USDC, and the Foundation accepted it.

52. When Lender sought information after the first advance, Ostium's response was slow and incomplete. The pattern changed when Ostium wanted another 10 million USDC. Kiernan-Linn personally returned, renewed the same risk-structure pitch, and solicited the second tranche.

53. Lender and the Foundation executed a second term sheet with an effective date of January 28, 2026 (the "Second Term Sheet"). Lender advanced another 10,000,000 USDC on January 29, 2026, and the Foundation accepted it.

54. The Foundation, Ostium Labs, DeltaX, Kiernan-Linn, and their affiliates then controlled, deployed, hedged, transferred, or benefited from that capital through the integrated Ostium enterprise.

**E. The Loan Agreement Requires Repayment and New York Arbitration**

55. The Master Agreement defines the relationship as lender and borrower. The Term Sheets provide fixed economic terms, call rights, repayment duties, default remedies, fees, and costs.

56. After a three-month non-callable period, each Term Sheet permits Lender to call the loan on at least ten calendar days' written notice. The specific Term Sheet provision controls any inconsistent general timing term.

57. Section XIV of the Master Agreement provides that New York law governs.

58. Section XIV further provides that any dispute arising out of or relating to the agreement or its breach that cannot be settled through negotiation "shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules."

59. The Foundation agreed that judgment on the award may be entered in any court having jurisdiction.

60. Lender supplied loan capital. He did not buy equity, subordinate his debt to platform users or insiders, or authorize the Foundation to shift repayment assets into affiliates beyond his reach.

**F. Ostium Hides That Its Principal Hedging Partner Is an Affiliate**

61. Before either advance, Ostium did not disclose that DeltaX performed or participated in the principal off-chain hedging function.

62. Ostium also did not disclose that DeltaX was created, owned, controlled, or capitalized in material part by Ostium insiders or affiliates.

63. Lender first learned the substance of the relationship after the security failure and default.

64. A separately owned institution brings its own credit, collateral, pricing, books, and incentives. DeltaX did not. It shared Ostium's managers, systems, liquidity, and failure risk.

65. The represented institutional hedging structure concealed the concentration and related-party conflicts in the structure Ostium sold.

66. Kiernan-Linn knew the truth. She co-founded and led Ostium Labs, was the Foundation's named contractual Key Person, and directed enterprise-wide liquidity, collateral, and creditor communications.

67. Lender reasonably relied on her because the ownership, capitalization, controls, and intercompany arrangements were nonpublic and uniquely within Defendants' possession.

68. Full disclosure would have changed the transaction. Lender would have refused both loans or required DeltaX financials, ownership records, intercompany agreements, collateral records, audit rights, minimum-capital covenants, direct recourse, and asset-segregation protections.

**G. Ostium's Privileged Off-Chain Controls Fail**

69. On July 9, 2026, the Foundation returned 5 million USDC and acknowledged that another 5 million USDC remained due under the second loan. The entire first 10 million USDC loan also remained unpaid. The outstanding principal was 15 million USDC.

70. During the July 9 repayment process, Kiernan-Linn said Ostium needed time to "migrate liquidity out of TradFi accounts and do collateral management." She also acknowledged that "comms remain fragmented across foundation/labs/hedging entity."

71. Kiernan-Linn's own words placed liquidity in traditional financial accounts, treated collateral as an enterprise problem, and treated the Foundation, Ostium Labs, and the hedging entity as one operational response.

72. Six days later, on July 15, 2026, Ostium suffered a catastrophic security failure.

73. Ostium's official incident account states that an attacker compromised the off-chain infrastructure feeding prices into the protocol and a privileged signer, then removed 23,752,746 USDC from the liquidity vault.[8]

74. The attacker exploited systems controlled by Ostium's operators. Those systems fell outside the public smart-contract code and the audit scopes Ostium used to build market confidence.

75. Ostium did not notify Lender before he and his representatives learned of the event through public reporting[9] and contacted Ostium themselves.

76. The exploit did not reduce the Foundation's written repayment duty. It made the enterprise's control failures, undisclosed concentration, and asset dissipation immediately relevant to whether Lender would ever be paid.

### H. The Foundation Defaults While Kiernan-Linn Directs the Enterprise Response

77. On July 22, 2026, Lender recalled both loans in writing and demanded return of the 15 million USDC balance.

---

[8] Ostium, detailed incident status (July 19, 2026), https://x.com/Ostium/status/2078640436688941194; official channel mirror, https://t.me/s/OstiumNews.

[9] See Exhibit 1 (Galaxy Research article concerning the Ostium exploit, July 17, 2026).

78. The ten-calendar-day repayment period expired on August 1, 2026. The Foundation did not pay.

79. On August 3, 2026, Lender sent a written notice of default. Any applicable contractual cure period expired without payment.

80. The Foundation remains in default. The executed documents, two advances, partial repayment, written acknowledgment, recalls, default notice, and continuing nonpayment establish a clear right to an arbitral award.

81. Kiernan-Linn personally controlled the response. On July 8 she told Lender that Ostium wanted to "sleeve everything into the spc at once" and that she was conducting "capital planning efforts for the private pool." On July 9 she said Ostium had to "migrate liquidity out of TradFi accounts and do collateral management." When Lender asked about the Foundation, she replied, "found it. ok, let me discuss," and admitted that communications were fragmented across "foundation/labs/hedging entity." She separately said Ostium would return the money, discussed using Ostium Labs capital to fill the shortfall, discussed raising additional capital, and later said Ostium lacked enough money but expected to raise it.

82. When those plans failed to produce payment, Kiernan-Linn directed Lender back to the Foundation—the Cayman entity holding the formal debt but only a fraction of the cash Ostium reported across the enterprise.

83. The Foundation owes at least 15 million USDC plus Borrow Fees, Late Fees, points, collection costs, attorneys' fees, and other amounts to be determined in the New York arbitration.

84. Plaintiff is preparing to file a Statement of Claim and will commence the AAA arbitration in New York County.

### I. Defendants Pool Cash, Move Value, and Invoke Separateness to Avoid Payment

85. Ostium's post-default financial materials show that the borrower's assets cannot be understood by looking at the Foundation alone.[10]

86. On August 29, 2026, after the debt had matured, Defendants circulated a proposed recovery framework imposing a shot clock that begins today, September 4, 2026, and dramatically reduces the recovery offered to creditors as the days pass. The rapidly declining recovery schedule was designed to force creditor elections before Defendants disclosed the accounts, custodians, transfer histories, and current disposition of enterprise funds.

87. The remaining 15 million USDC was loan capital advanced for the stated off-chain hedge and repayment structure. Defendants have returned only 5 million USDC in principal, have not traced the balance, and have not accounted for it. Plaintiff seeks the identifiable capital, unpaid contractual amounts, and every traceable substitute Defendants' wallets, accounts, and ledgers will show.

88. Defendants control the bank statements, wallets, exchange and custodian records, hedging accounts, intercompany ledgers, fee records, and transaction-level data needed to explain the gap. They have not supplied a complete accounting.

89. Kiernan-Linn discussed using Ostium Labs capital to fill the Foundation's hole, and Defendants then offered DeltaX credit and Labs equity against Foundation debt. On information and belief, the Foundation transferred loan proceeds, enterprise revenue, collateral, or other value to Ostium Labs, DeltaX, DX Group, insiders, selected creditors, or Doe Transferees without reasonably equivalent value while it could not pay the matured 15 million USDC.

---

[10] The details of these commingled funds are presented in the accompanying TRO papers and declarations, which will be filed partially under seal, and which are incorporated in the Complaint.

90. On information and belief, additional transfers occurred after the exploit, recall, or default while Defendants knew that Lender's 15 million USDC claim had matured and that enterprise liquidity was insufficient to pay every constituency in full.

91. The circumstances support actual intent to hinder or delay collection: insider and affiliate recipients; common control; pooled financial reporting; retention of control; missing transaction-level disclosure; a matured debt; proposed impairment of the debt; rapid digital-asset mobility; and continued spending while the borrower refused payment.

92. The risk is immediate. Digital assets can move across wallets, entities, exchanges, custodians, and borders in minutes. Traditional accounts, hedging receivables, and counterparties can be retitled, pledged, or paid before the arbitral tribunal is constituted.

### J. The Foundation, Ostium Labs, DeltaX, DX Group, and Kiernan-Linn Are One Enterprise

93. Ostium publicly presents one platform under one name while allocating borrowing, operations, technology, hedging, treasury, and cash among nominally separate entities.

94. The Foundation borrowed Lender's capital. Ostium Labs built and operated the business. DeltaX performed the hedging. DX Group carried the enterprise's offsetting intercompany receivables and payables. Kiernan-Linn controlled those functions in practice.

95. The Master Agreement itself defines a "Key Person Event" to include the event that Kiernan-Linn "ceases to be actively involved in or responsible for the management or investment decision making of Borrower."

96. Kiernan-Linn directed the solicitation of both loans, described the hedging capacity, controlled repayment communications, discussed "TradFi accounts" and collateral management, admitted communications were fragmented across the Foundation, Labs, and the

hedging entity, offered Labs resources, directed fundraising, and routed the creditor back to the Foundation.

97. Defendants' own August 29 restructuring plan treated the Foundation, Ostium Labs, and DeltaX as components of one recovery structure and used a rapidly declining recovery schedule to press creditors for binding elections and releases.

98. The Foundation was inadequately capitalized for the obligations Ostium caused it to undertake. It relied on affiliates and common management to conduct the business for which it borrowed Lender's assets.

99. Defendants used domination and nominal separateness to accomplish the wrong. They placed the debt in the Foundation; used the common enterprise to solicit, deploy, hedge, and move the proceeds; routed material value through intercompany receivables and payables among the Foundation, Ostium Labs, DeltaX, and DX Group; and invoked the Foundation's separate identity only after the debt matured.

100. If the Court respects that paper structure, the people who took Lender's capital keep the enterprise, and the New York award hits an empty Cayman shell. Applicable Cayman, Delaware, and New York veil-piercing principles prevent that result.

## CLAIMS FOR RELIEF

### COUNT I — ATTACHMENT AND INJUNCTIVE RELIEF IN AID OF ARBITRATION
***(Against the Foundation)***

101. Plaintiff repeats and realleges all preceding paragraphs.

102. Plaintiff is commencing a final, binding AAA arbitration in New York County under the Master Agreement.

103. Plaintiff is likely to obtain an award of at least 15 million USDC plus contractual fees, interest, attorneys' fees, costs, and other relief. The Foundation's executed agreements,

acceptance of two 10 million USDC advances, 5 million USDC repayment and acknowledgment, recall, default, and nonpayment establish probable success.

104. On information and belief, the Foundation is a foreign company and nondomiciliary not qualified to do business in New York, making attachment available under CPLR 6201(1). Independently, attachment is available under CPLR 6201(3). On information and belief, and as alleged, the Foundation, acting through and with the other Defendants, has assigned, disposed of, encumbered, or secreted property, or removed property from the state, or is about to do any of those acts, with intent to defraud creditors or frustrate enforcement of the award Plaintiff expects to obtain and any judgment confirming it. After the debt matured, Defendants circulated the recovery framework described above, using a shot clock to press creditors to accept dramatically declining recoveries while the Foundation refused payment of the matured debt. On July 9, 2026, Kiernan-Linn described Ostium as needing to "migrate liquidity out of TradFi accounts" and conduct collateral management, and separately admitted that communications remained fragmented across the Foundation, Ostium Labs, and the hedging entity. After the debt matured, Defendants withheld the institutions, accounts, current balances, and transfer histories needed to trace those movements. Those evidentiary facts, together with insider and affiliate recipients, common control, pooled financial reporting, missing transaction-level disclosure, the unpaid matured debt, the proposed impairment, rapid digital-asset mobility, and continued spending while the Foundation refused payment, support the inference of intent.

105. An award will be rendered ineffectual without provisional relief. The borrower has defaulted on a matured 15 million USDC debt; the enterprise lost 23,752,746 USDC through a privileged off-chain security failure; the Foundation reports minimal assets in its own accounts; substantial cash appears at the combined Foundation/DeltaX level; projected spending continues;

and liquid assets can be moved before an award enters. Ostium told Lender that the enterprise funds and bank accounts were in New York. Kiernan-Linn later wrote that Ostium held liquidity in "TradFi accounts." Those accounts, and every debt owed the Foundation that New York process can reach, should be attached now.

106. Rule 64, CPLR 7502(c), and CPLR Article 62, including CPLR 6201(1) and (3), authorize attachment up to 15 million USDC or its dollar equivalent, plus accrued contractual amounts, against the Foundation's property and debts subject to New York process.

107. Rule 65 and CPLR 7502(c) also authorize narrowly targeted preservation of property subject to attachment, loan proceeds, traceable substitutes, and voidable transfers. Absent that relief, property will be dissipated or placed beyond the Court's and tribunal's reach.

108. The balance of hardships favors preserving assets needed to satisfy a clear contractual obligation. The public interest favors effective arbitration and enforcement of matured debts.

109. Plaintiff will provide the undertaking the Court sets under CPLR 6212(b).

110. Expedited discovery is necessary to identify accounts, wallets, custodians, exchanges, counterparties, receivables, transfers, transferees, and garnishees subject to New York process.

**COUNT II — FRAUDULENT INDUCEMENT AND FRAUDULENT CONCEALMENT**
***(Against Kiernan-Linn and Ostium Labs)***

111. Plaintiff repeats and realleges all preceding paragraphs.

112. Kiernan-Linn personally made and directed transaction-specific statements to Lender through Telegram, calls, a written proposal, and New York meetings before the October 20, 2025 and January 29, 2026 advances.

113. Before the loans, Kiernan-Linn made specific statements about Ostium's existing resources and structure. On May 14, 2025, she wrote that Ostium had "enough capital to sustain immediate required hedging activity." Before the loans, she represented to the Lender that Ostium's strategy was delta-neutral and that directional exposure would be hedged off-chain through institutional counterparties.

114. Those statements described present facts: the resources then available for hedging; who performed the hedging; whether the counterparties were separate; how capital would be deployed; and whether the structure supplied independent controls and counterparty credit.

115. The principal hedging partner was DeltaX, an entity created, owned, controlled, or capitalized in material part by Ostium insiders. DeltaX shared Ostium's managers, systems, liquidity, and failure risk. Representing that the hedging would be performed by independent institutional counterparties was false or materially misleading.

116. Kiernan-Linn and Ostium Labs also concealed that the critical off-chain control structure they invoked fell outside the scope of Ostium's smart-contract audits. The 2024 and 2025 audit reports confirm that infrastructure and key custody were excluded, even though those privileged systems were central to protecting and pricing the enterprise's positions.

117. Having chosen to speak about the counterparties, institutional character, location, capacity, security, and protective structure, Kiernan-Linn had a duty to disclose the related-party relationship and the actual limits of the controls.

118. Kiernan-Linn knew the facts. She co-founded and led Ostium Labs, served as the Foundation's Key Person, controlled liquidity and collateral communications, and had unique access to DeltaX's ownership and the enterprise's security architecture.

119. She intended Lender to rely. She made and directed the statements while soliciting the first advance and personally returned to secure the second.

120. Lender reasonably relied because Defendants' ownership, capitalization, intercompany arrangements, hedging accounts, privileged systems, and audit limitations were nonpublic and uniquely within Defendants' knowledge.

121. The concealed facts were material. Lender would have refused the loans or required independent financials, ownership disclosures, collateral records, security controls, audit rights, minimum capital, direct recourse, and segregation protections.

122. The fraud caused Lender to enter transactions he would otherwise have rejected, expose 20 million USDC to a commonly controlled enterprise, and lose the independent counterparty recourse and safeguards he believed protected his capital.

123. Plaintiff owns the assigned fraud and concealment claims and seeks out-of-pocket damages, investigation and tracing costs, punitive damages, and other relief without double recovery.

**COUNT III — NEGLIGENT MISREPRESENTATION**
***(Against Kiernan-Linn and Ostium Labs)***

124. Plaintiff repeats and realleges all preceding paragraphs.

125. Kiernan-Linn and Ostium Labs possessed specialized knowledge of Ostium's ownership, DeltaX relationship, hedging capacity, security architecture, privileged controls, and use of lender capital.

126. They knew Lender would use that information to decide whether to advance each 10 million USDC tranche. Their direct Telegram communications, calls, proposal, and New York meetings created a relationship approaching privity.

127. They supplied materially inaccurate and incomplete information about the independence, concentration, capitalization, controls, and security of the structure protecting Lender's capital.

128. They failed to exercise reasonable care in obtaining and communicating that information.

129. Lender reasonably relied, advanced 20 million USDC, and suffered the assigned damages alleged above.

**COUNT IV — NEGLIGENCE AND GROSS NEGLIGENCE**
***(Against Ostium Labs and Kiernan-Linn)***

130. Plaintiff repeats and realleges all preceding paragraphs.

131. Ostium Labs and Kiernan-Linn took Lender's capital into an enterprise they operated. They controlled the off-chain hedging, liquidity, collateral, pricing infrastructure, and privileged signer through which that capital was supposed to be protected and repaid.

132. That control created duties independent of the Foundation's promise to pay: reasonable access controls, signer security, infrastructure segregation, monitoring, incident response, and protection of entrusted or traceable digital assets in the structure they ran.

133. The risk was foreseeable and known. DeFi platforms had repeatedly lost substantial assets through privileged credentials and off-chain infrastructure. Ostium's own audits excluded infrastructure and key custody from their scope.

134. Defendants breached their duties by failing to maintain reasonable controls over the off-chain pricing system and privileged signer that the attacker compromised.

135. Those failures depleted enterprise liquidity, broke the hedging and repayment structure Ostium Labs and Kiernan-Linn had undertaken to run, and forced investigation and tracing costs beyond the Foundation's bare nonpayment. Defendants' wallets, ledgers, and

intercompany records will show whether loan proceeds or traceable substitutes sat in the compromised vault or related accounts. Until they produce those records, the operator-side failure still caused the loss of the protective structure Lender was sold.

136. Defendants' disregard of known, unaudited, mission-critical attack surfaces while controlling tens of millions of dollars was grossly negligent.

**COUNT V — VOIDABLE TRANSFERS AND TRANSFEREE LIABILITY**
**(*Against the Foundation, Ostium Labs, DeltaX, DX Group, and Doe Transferees*)**

137. Plaintiff repeats and realleges all preceding paragraphs.

138. Plaintiff is a present creditor of the Foundation by assignment of the matured 15 million USDC claim.

139. On information and belief, after the exploit and while the Foundation was insolvent or unable to pay debts as they came due, the Foundation transferred loan proceeds, enterprise revenue, cash, collateral, receivables, or other property to Ostium Labs, DeltaX, DX Group, insiders, selected creditors, or Doe Transferees. The combined forecast captioned "Ostium Foundation and DeltaX LTD," separate Foundation snapshot, cross-entity repayment discussions, and proposed DeltaX guaranty supply the factual basis; the dates, amounts, accounts, wallets, consideration, and recipients are uniquely within Defendants' records.

140. On information and belief, one or more transfers lacked reasonably equivalent value and left the Foundation insolvent, undercapitalized, or unable to satisfy Lender's matured debt.

141. On information and belief, one or more transfers were made with actual intent to hinder, delay, or defraud collection. The badges of fraud include insider recipients, common control, pooled reporting, retention of control, missing transaction-level books, a reported gap of millions of dollars between the combined Foundation/DeltaX beginning cash and the Foundation's

own snapshot, transfer activity after the exploit and default, continued spending, and a proposed impairment of the debt.

142. On information and belief, Ostium Labs, DeltaX, DX Group, and the Doe Transferees participated in, benefited from, or received the transfers and hold the proceeds or traceable substitutes.

143. The law governing each transfer will be determined from the debtor's location and transaction facts. Plaintiff seeks avoidance, attachment, preservation, recovery from transferees, and other relief under New York Debtor and Creditor Law §§ 273, 274, 276, and 279 and the applicable Cayman, Delaware, or other analogous law.

**COUNT VI — CONVERSION**
***(Against All Defendants)***

144. Plaintiff repeats and realleges all preceding paragraphs.

145. The Foundation owes 15 million USDC to Plaintiff plus interest and fees.

146. The unpaid 15 million USDC was loan capital advanced for the stated off-chain hedge and repayment structure. Defendants have returned only 5 million USDC in principal, have not traced the balance, and have not accounted for it. Plaintiff seeks the identifiable capital, unpaid contractual amounts, and every traceable substitute Defendants' wallets, accounts, and ledgers will show.

147. Defendants exercised unauthorized dominion over that property by transferring, pooling, encumbering, dissipating, or retaining it for purposes inconsistent with the represented structure and Plaintiff's matured right to return.

148. Plaintiff demanded return and an accounting. Defendants have returned only 5 million USDC and have not provided a transaction-level accounting for the remainder.

149. Plaintiff seeks recovery of the identifiable property and traceable substitutes and damages caused by the wrongful dominion.

**COUNT VII — CONSTRUCTIVE TRUST, EQUITABLE LIEN, RESTITUTION, AND ACCOUNTING**
***(Against All Defendants)***

150. Plaintiff repeats and realleges all preceding paragraphs.

151. Defendants obtained and controlled loan proceeds, segregated hedging assets, traceable substitutes, enterprise revenue, and property recoverable as voidable transfers.

152. Defendants cannot retain or dissipate that property after inducing the advances through material misstatements and omissions, pooling value across affiliates, and leaving the nominal borrower unable to pay.

153. Plaintiff is entitled to a constructive trust, equitable lien, restitution, and an accounting over identifiable proceeds, traceable substitutes, and recoverable transfers.

154. Defendants control the wallet, bank, custodian, exchange, hedging, fee, and intercompany records needed to identify the property, recipients, consideration, and present location.

**COUNT VIII — DECLARATORY JUDGMENT: ALTER-EGO LIABILITY**
***(Against the Foundation, Ostium Labs, DeltaX, DX Group, and Kiernan-Linn)***

155. Plaintiff repeats and realleges all preceding paragraphs.

156. An actual controversy exists over whether Defendants may confine an arbitral award to the Foundation while Ostium Labs, DeltaX, DX Group, and Kiernan-Linn control or retain assets, operations, and enterprise value generated with Lender’s capital.

157. Ostium Labs, DeltaX, DX Group, and Kiernan-Linn exercised complete domination over the Foundation with respect to the loans, use and custody of proceeds, off-chain hedging, operational security, creditor communications, and disposition of remaining assets.

158. Defendants used that domination to park the debt in an undercapitalized Foundation based in the Cayman Islands, divert the loan proceeds to Ostium Labs, DeltaX, and DX Group, report the cash on a combined basis for the Foundation and DeltaX, and deny Lender repayment when the debt came due.

159. The domination and misuse of form caused the injury and will render the arbitral award ineffectual unless the entities and controller are treated as alter egos according to economic reality.

160. Plaintiff is entitled to a declaration under applicable Cayman and Delaware law and, in the alternative, New York law, that Ostium Labs, DeltaX, DX Group, and Kiernan-Linn are alter egos of the Foundation and that the forthcoming arbitral award is enforceable against them.

**PRAYER FOR RELIEF**

161. WHEREFORE, Plaintiff respectfully requests that the Court enter judgment and orders:

A. Recognizing and enforcing the agreement to arbitrate and, if necessary, directing the Foundation to proceed with the AAA arbitration in New York County;

B. Attaching under Rule 64, CPLR 7502(c), and CPLR Article 62, including CPLR 6201(1) and (3), up to 15 million USDC or its dollar equivalent, plus accrued contractual amounts, interest, fees, and costs, against the Foundation's property and debts subject to New York process;

C. Temporarily and preliminarily enjoining Defendants and persons acting in concert with them from transferring, dissipating, encumbering, concealing, or impairing

property subject to attachment, identifiable loan proceeds, traceable substitutes, and voidable transfers;

D. Requiring preservation of wallets, keys, accounts, ledgers, bank and custodian statements, exchange records, hedging records, intercompany records, security logs, forensic materials, communications, cash forecasts, and other evidence concerning the assets and claims at issue;

E. Granting expedited discovery from Defendants and third parties to identify the location, holder, controller, beneficial owner, value, transfer history, and New York situs or garnishee of assets and debts subject to attachment or equitable relief;

F. Avoiding voidable transfers, enjoining further disposition, imposing a constructive trust and equitable lien, ordering an accounting, appointing a receiver if authorized and necessary, and awarding recovery against transferees;

G. Declaring that the arbitral award against the Foundation is enforceable against Ostium Labs, DeltaX, DX Group, and Kiernan-Linn as alter egos or instrumentalities under applicable law;

H. Awarding compensatory, out-of-pocket, restitutionary, and punitive damages on the tort claims in amounts to be proved;

I. Awarding pre-judgment and post-judgment interest, attorneys' fees, expenses, and costs to the extent permitted by contract, statute, rule, or equity; and

J. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on every claim and issue so triable.

Dated: September 4, 2026

Respectfully submitted,

**SHOEMAKER GHISELLI + SCHWARTZ LLC**
By: */s/ Adam B. Stern*
Adam B. Stern
1811 Pearl Street
Boulder, Colorado 80302
Telephone: (303) 923-8672
astern@sgslitigation.com

**BURSHTEYN POLIN LLP**
Michael Burshteyn
Jacob Polin
1212 Broadway Plaza, Suite 2100
Walnut Creek, California 94596
Telephone: (925) 238-3119
mike@burshteynpolin.com
jacob@burshteynpolin.com
*Pro hac vice applications forthcoming*

**THE CRYPTO LAWYERS, PLLC**
Rafael Yakobi
11035 Lavender Hill Drive, Suite 160-220
Las Vegas, Nevada 89135
Telephone: (619) 317-0722
rafael@thecryptolawyers.com
*Pro hac vice application forthcoming*

*Attorneys for Plaintiff ESS FRONTIER LLC*