**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESS FRONTIER LLC,

Plaintiff,

-against-

OSTIUM FOUNDATION; OSTIUM LABS CO.; DELTAX LTD.; DX GROUP LIMITED; KALEDORA KIERNAN-LINN; and JOHN DOE TRANSFEREES 1-10,

Defendants.

**Case No.** 1:26-cv-07645

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY EX PARTE MOTION FOR AN ORDER OF ATTACHMENT IN AID OF ARBITRATION, TEMPORARY RESTRAINT, EXPEDITED DISCOVERY, AND ORDER TO SHOW CAUSE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1
FACTUAL BACKGROUND .......... 3
A. Ostium, Through its Purported "Foundation," Borrowed 20 Million USDC from Plaintiff and Defaulted .......... 3
B. Ostium Solicited the Loans Through New York and Represented That Its Accounts Were Maintained in New York .......... 4
C. Ostium's Blockchain Activities, Financial Statements, Cash Burn, and Dissipation Plans Show that it is Commingling Funds and Preparing to Frustrate Recovery .......... 5
D. The Financial Statements Ostium is Providing are Incomplete and Raise More Questions than they Answer .......... 7
E. Ostium and KKL are Imminently Planning to Dissipate Assets and at Risk of Further Hacks Even if they Don't .......... 8
ARGUMENT .......... 9
I. Legal Standard .......... 9
II. ESS Frontier LLC Is Likely to Succeed in Arbitration .......... 11
  A. The Written Loan Documents and Undisputed Performance Establish the Contract Claim .......... 11
  B. The Foundation's Post-Default Conduct Confirms the Debt .......... 13
  C. No Known Counterclaim Reduces the $15 Million Claim .......... 13
III. The Circumstances Satisfy CPLR 6201(1) and 6201(3)'s Attachment Grounds .......... 13
IV. Without Attachment, the Record Shows That the Arbitral Award May Be Rendered Ineffectual .......... 14
V. The Court Should Exercise Its Discretion to Secure a Recovery that Would Otherwise be Compromised .......... 15
VI. New York Law Permits Attachment of Foundation Debts and Intangible Property Through the Proper Garnishee .......... 16
  A. The Identified Accounts and Intercompany Claims Are Proper Subjects of Article 62 16
VII. Expedited Discovery Is Necessary and Narrowly Tailored to Complete the Levy .......... 18
VIII. Rule 65 Independently Supports a Narrow Restraint Over the Property at Issue .......... 19
  A. Federal Equity Power Authorizes Preservation of the Assets .......... 19
  B. Plaintiff Is Likely to Succeed on Its Fraud Claim .......... 20
  C. The Same Record Supports the Related Negligence, Transfer, Equitable, and Alter-Ego Claims .......... 21
  D. Dissipation Will Cause Irreparable Harm Before Defendants Can Be Heard .......... 22
  E. The Equities Overwhelmingly Favor a Short, Asset-Specific Restraint .......... 22
  F. The Public Interest Strongly Favors Stopping, Investigating, and Remedying This Fraud .......... 23
IX. Immediate Post-Entry Notice, a Prompt Return Date, and Security Satisfy Due Process 23
CONCLUSION .......... 24
CERTIFICATE OF COMPLIANCE .......... 26

## TABLE OF AUTHORITIES

**Cases**

*Ayyash v. Bank Al-Madina*, 233 F.R.D. 325 (S.D.N.Y. 2005)....................18
*Binghamton Precast & Supply v. A. Servidone, Inc./B. Anthony Construction Corp.*, 257 A.D.2d 731 (3d Dep't 1999)....................12
*Brenntag International Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999)....................22
*Capital Ventures International v. Republic of Argentina*, 443 F.3d 214 (2d Cir. 2006)....................10
*DDJ Management, LLC v. Rhone Group L.L.C.*, 15 N.Y.3d 147 (2010)....................21
*Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)....................19
*Gerber v. Empire Scale*, 147 A.D.3d 1434 (4th Dep't 2017)....................12
*Gucci America, Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014)....................19
*Haverhill Coke Co. LLC v. Algoma Steel, Inc.*, 2026 WL 2348417 (S.D.N.Y. Aug. 13, 2026)....10
*Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 (2010)....................10
*Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263 (2d Cir. 2022)....................1, 9
*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413 (1996)....................20
*Leadenhall Capital Partners LLP v. Advantage Capital Holdings, LLC*, 171 F.4th 155 (2d Cir. 2026)....................19
*Legacy Investments Holdings, LLC v. John Does 1–20*, No. 3:25-cv-08800 (N.D. Cal. Oct. 23, 2025)....................23
*MAG Portfolio Consult, GmbH v. Merlin Biomed Group LLC*, 268 F.3d 58 (2d Cir. 2001)....................22
*Matter of Sojitz Corp. v. Prithvi Info. Solutions Ltd.*, 82 A.D.3d 89 (1st Dep't 2011)....................10
*Pantheon Properties, Inc. v. Houston*, 2022 WL 785168 (S.D.N.Y. Mar. 14, 2022)....................14
*Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986)....................22
*Sage Systems, Inc. v. Liss*, 39 N.Y.3d 27 (2022)....................12
*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010)....................10
*SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79 (2d Cir. 2000)....................10
*Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008)....................12
*VisionChina Media Inc. v. Shareholder Representative Services, LLC*, 109 A.D.3d 49 (1st Dep't 2013)....................14
*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)....................10

**Statutes, Rules, and Other Authorities**

Federal Rule of Civil Procedure 26(d)....................18
Federal Rule of Civil Procedure 30(b)(6)....................18, 25
Federal Rule of Civil Procedure 34....................18
Federal Rule of Civil Procedure 43(c)....................24, 25
Federal Rule of Civil Procedure 45....................18, 25
Federal Rule of Civil Procedure 64....................19
Federal Rule of Civil Procedure 65....................3, 10, 19, 24, 25
N.Y. C.P.L.R. 5201....................16
N.Y. C.P.L.R. 6201....................9, 13, 14
N.Y. C.P.L.R. 6202....................16
N.Y. C.P.L.R. 6211....................24
N.Y. C.P.L.R. 6212....................9
N.Y. C.P.L.R. 6219....................17, 25

N.Y. C.P.L.R. 6220 ... 17
N.Y. C.P.L.R. 7502(c) ... 1, 9, 10
S.D.N.Y. Local Civil Rule 6.1(d) ... 24
S.D.N.Y. Local Civil Rule 7.1(c) ... 26

## PRELIMINARY STATEMENT

A New York-based crypto project called Ostium induced Plaintiff into handing over $20 million by fraud.[1] Ostium then failed to stop a devastating hack that resulted in over $23 million in losses. Now, Ostium plans to dissipate what money remains as fast as possible while millions of dollars are unaccountable based on public blockchain tracing.

Plaintiff has a contractual right to 15,000,000 in USDC, a crypto stablecoin, that Ostium is refusing to repay. Plaintiff's right is enforceable in arbitration, which Plaintiff is imminently commencing following this filing. Without this Court's intervention and provisional relief, the eventual arbitration award is likely to be rendered ineffectual. Yet Ostium has told Plaintiff that starting today, September 4, 2026, it will be depleting its coffers to others who wish to take a greater reduction on their owed capital than Plaintiff. New York law, N.Y. C.P.L.R. § 7502(c), provides that under such circumstances, this Court has the authority to issue an emergency attachment and injunction to stop the dissipation. *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 269-70 (2d Cir. 2022).

Further, Plaintiff's investigation shows that Ostium is nothing more than the alter ego of its founder, Kaledora Kiernan-Linn ("KKL"). KKL set up a maze of entities purporting to maintain nominal separation, but which actually share and commingle assets in an arbitrary fashion. KKL controls these obfuscated entities via blockchain smart software contracts and private keys over which she exercises dominion. She made a slew of knowingly false representations to induce Plaintiff to hand over millions of dollars in funds to her, including (a) that the Ostium entities were separate; (b) that Ostium was more secure than other crypto projects because it hedged its assets away from blockchains and in traditional financial institutions; (c) that

[1] Plaintiff has been assigned the claims of the lender to with whom Ostium contracted. This Complaint references Plaintiff throughout as standing in the shoes of the lender when describing the historical record and present situation.

Ostium worked with arm's-length institutional financial partners that would reduce the risk; and (d) Plaintiff's capital would be deployed through that institutional hedging structure outside the blockchain.

These assurances by KKL were all false. KKL knew that there was no entity separation and in reality she was fully in control of Ostium. She knew that Ostium fell far short of cybersecurity standards, which is what led to the devastating hack that resulted in more than $23 million being exfiltrated from the platform. She concealed that a substantial portion of Plaintiff's funds would be rerouted to other entity accounts and used as Ostium's own liquidity to clear, settle, and cover trading losses. Now, with the platform in irrecoverable shambles, KKL continues to try to operate it. She continues to gamble the assets daily through the complex obfuscated blockchain hedging apparatus she created. She has explicitly promised to dissipate the assets such that Plaintiff will be unable to recover its funds. The arm's-length institutional financial partner KKL touted, Plaintiff recently discovered, is actually owned by KKL.

These fraudulent misrepresentations and the circumstances of the platform after the hack necessitate additional relief under Rule 65. Plaintiff is likely to succeed on its claims for fraud and negligence against KKL and the Alter Ego Defendants.[2] Without emergency injunctive relief, Plaintiff will suffer irreparable harm because the assets will become irrecoverable—no money judgment at the end of the case will suffice. The balance of the equities tilt far in favor of the Plaintiff, as KKL and the Alter Ego Defendants should not be rewarded for building their business on unlawful conduct. There is a strong public interest in the nascent crypto industry not turning into a lawless maze of obfuscated entities from which individual founders enrich themselves at the expense of investors and creditors.

---

[2] This brief refers to the Defendants as a group as the Alter Ego Defendants and as Ostium.

With both avenues for relief satisfied, pre-arbitration attachment and a temporary restraining order, now only this Court can stop KKL's imminent plan to disappear Plaintiff's funds.

## FACTUAL BACKGROUND

### A. Ostium, Through its Purported "Foundation," Borrowed 20 Million USDC from Plaintiff and Defaulted

On October 20, 2025, Plaintiff, through its assignor (the "Lender"), and the Foundation executed the Master Digital Currency Loan Agreement (the "Master Agreement") and the first Loan Term Sheet (collectively with the second Loan Term Sheet, the "Loan Documents"). The Master Agreement chooses New York law and requires final AAA arbitration in New York County. The Lender advanced the first 10 million USDC on October 20 and October 21, 2025. (Declaration of Minghui Zheng ("Zheng Decl.") ¶¶ 3–4 & Ex. B.)

Several months later, the parties executed a second 10 million USDC Loan Term Sheet with an effective date of January 28, 2026. The Lender advanced the second 10 million USDC on January 29, 2026. The Foundation accepted both advances and never disputed that the Loan Documents governed the transactions. (Zheng Decl. ¶ 5 & Ex. C.)

The Foundation returned 5 million USDC on July 9, 2026. In the Loan Repayment Notice signed by both parties, the parties confirmed that "the remaining balance of 5,000,000 USDC . . . continues to be outstanding and shall remain subject to the terms and conditions of the Loan Agreement" and that the Agreement "shall continue in full force and effect" as to that balance. The first 10 million USDC loan also remained unpaid. (Zheng Decl. ¶ 6 & Ex. D.)

On July 22, 2026, the Lender recalled both loans in writing following Ostium's security breach. The ten-day contractual repayment period expired on August 1, 2026, at 5:00 p.m. New York time. The Lender delivered written notice of default on August 3, 2026. The Foundation has not paid any part of the remaining 15 million USDC principal balance and has asserted no

counterclaim or contractual offset that equals or exceeds it. (Zheng Decl. ¶¶ 7–9; Hamilton Decl. Ex. 2 at 30.)

On September 4, 2026, the Lender assigned to ESS Frontier LLC (Plaintiff) the loans and all related contractual, arbitration, provisional-remedy, tracing, transfer, and enforcement rights. (Zheng Decl. ¶ 2 & Ex. A.) Plaintiff is commencing the AAA arbitration in New York County imminently following this filing.

### B. Ostium Solicited the Loans Through New York and Represented That Its Accounts Were Maintained in New York

KKL personally solicited the Lender. She invited him to Ostium's Williamsburg office and pitched Ostium as a more secure blockchain project than other decentralized blockchain projects that had been hacked, because of its off-chain hedging infrastructure and nominal separation. She continued to direct the relationship after funding—all from New York. (Zheng Decl. ¶ 14 & Ex. E.)

To induce funding, KKL represented directly to the Lender that Ostium's strategy was delta-neutral, directional exposure would be hedged off-chain, and arm's-length institutional counterparties would perform the hedge. The Lender took those statements at face value and relied on them in making fixed-term USDC loans rather than a speculative DeFi investment. (Zheng Decl. ¶¶ 10–14 & Ex. E.) She also represented that funds, bank accounts, and trading accounts controlled through the Ostium entities were maintained in New York.

On May 14, 2025, for instance, KKL represented to the Lender that Ostium had "enough capital to sustain immediate required hedging activity." On October 15, 2025, she said Ostium was "opening up a few million for a couple investors." Those messages represented that Ostium had the capital and hedging capacity to accept the Lender's money in the specific commercial-loan opportunity it offered him. (Zheng Decl. ¶ 14 & Ex. E.)

KKL was closely involved in enterprise capital planning. On July 8, 2026, she wrote that Ostium wanted to "sleeve everything into the spc at once" and that she was handling "capital planning efforts for the private pool." On July 9, 2026, she wrote that Ostium had to "migrate liquidity out of TradFi accounts and do collateral management." When the Lender asked about the Foundation, she replied, "found it. ok, let me discuss." She also referred to the various entities as one, describing them as the "foundation/labs/hedging entity." (Zheng Decl. ¶ 16 & Ex. E.)

### C. Ostium's Blockchain Activities, Financial Statements, Cash Burn, and Dissipation Plans Show that it is Commingling Funds and Preparing to Frustrate Recovery

Plaintiff engaged an expert witness, Benedict Hamilton who is the Managing Director, Global Lead Blockchain Forensics for Kroll. (*See* Hamilton Decl.) According to his investigation, there are a variety of suspicious and concerning patterns in Ostium's blockchain architecture of wallets and transaction patterns. First, the software smart contracts that govern the Ostium network of accounts are under centralized control by addresses affiliated with a Harvard University club—which is where KKL studied and met her cofounder. While representing that the relevant software is controlled by multiple different signing authorities, in reality the investigation shows that KKL had control over them. Further, the investigation shows that KKL and the Alter Ego Defendants commingle and flow funds to and from various entities that are purportedly separate and nominal at high volumes. The investigation also shows that Plaintiff's funds did not go where Plaintiff was led to believe they would go—instead they were used for a variety of purposes, including covering trading activities and losses. (Hamilton Decl. ¶¶ 39–46.)

Further, Ostium supplied financial statements after the cyberattack, on July 31, 2026, that show alarming data about the Alter Ego Defendants' finances. The Foundation reported approximately [redacted] million in current assets, approximately [redacted] million in liabilities, and

approximately [redacted] million in negative equity. Its liabilities included about [redacted] million in loans and [redacted] million in accounts payable. (Zheng Decl. ¶ 21 & Ex. I.)

The Foundation statement also carries approximately [redacted] million in intercompany receivables. Approximately [redacted] million of its accounts payable was reported as owed to Ostium Labs and was described as [redacted]. Those entries show that timing, collectability, and payment priority for material obligations are controlled within the alleged enterprise. (Zheng Decl. ¶ 21 & Ex. I.)

The Foundation advanced approximately [redacted] million to DeltaX US. The accompanying materials state that hedging produced approximately [redacted] million in losses, that the activity ceased, and that the Foundation wrote its investment [redacted]. The records describe substantial movements of value through affiliates coupled with different accounting treatments at different entities.

DeltaX reported approximately [redacted] million in assets, including approximately [redacted] million in brokerage accounts and approximately [redacted] million in cash. Its statement also reported approximately [redacted] million in intercompany payables, other liabilities, and approximately [redacted] million in negative equity. (Zheng Decl. ¶ 21 & Ex. I.) Most reported liquid enterprise assets therefore sit outside the Foundation's own balance sheet even though the Foundation is the borrower.

DX Group reported approximately [redacted] million in assets, almost all of it in approximately [redacted] million of intercompany receivables, and approximately [redacted] million in intercompany payables. It reported only approximately [redacted] in cash and [redacted]. (Zheng Decl. ¶ 21 & Ex. I.) Ostium Labs reported approximately [redacted] million in cash, approximately [redacted] million in receivables, approximately [redacted] million in assets, and only approximately [redacted] in liabilities. (Zheng Decl. ¶ 21 & Ex. I.)

The statements paint a clear picture: the Alter Ego Defendants move funds around like musical chairs to prop up the enterprise under KKL's centralized control and to frustrate creditors such as Plaintiff from their collection efforts.

**D. The Financial Statements Ostium is Providing are Incomplete and Raise More Questions than they Answer**

In a report provided on August 7, 2026, what purports to be the Ostium Foundation shows approximately [redacted] million in Foundation cash. Ostium's materials separately identify an [redacted] Bank Account, a [redacted] Bank Account, digital-asset wallets, and other account categories. (Zheng Decl. ¶¶ 17, 22 & Ex. F.)

A separate DeltaX schedule reports approximately [redacted] million in cash and equivalents, including approximately [redacted] million in hedging accounts, approximately [redacted] million in a multisignature account, and a nominal Arbitrum wallet balance. (Zheng Decl. ¶ 18 & Ex. G.) The July entity statement and this cash schedule use different dates or classifications, and Ostium's records do not consistently distinguish DeltaX Ltd., DeltaX US, and DeltaX Cayman. The schedules are not reconciled in the present record. That mismatch, together with the missing institution-level information, is itself a reason for targeted disclosure to determine which entity holds the account and which portion is Foundation property or a debt payable to the Foundation.

Amidst its obfuscated cash picture, Ostium is burning money very quickly in the aftermath of the incident. The August 22, 2026 forecast combines Foundation and DeltaX liquidity under the heading "Ostium Foundation and DeltaX LTD," starts at approximately [redacted] million, and projects approximately [redacted] million in Foundation/DeltaX net outflow. It separately projects approximately [redacted] million in Ostium Labs net outflow. (Zheng Decl. ¶¶ 19–20 & Ex. H.) Across the two forecast categories, Ostium planned approximately [redacted] million in net outflows while the Foundation's matured debt remained unpaid.

The same forecast projects approximately [redacted] million in excess cash after applying the [redacted] million working-capital reserve. (Zheng Decl. ¶ 19 & Ex. H.) Notably, Ostium does not project an inability to pay the Foundation's matured debt. It projects what it will retain, distribute, and pledge instead of paying it.

With respect to the lender's money, it appears that the funds were not used for the expected purpose. From the October 2025 advance, for instance, Kroll traced the funds through the f0bf multisig: approximately 7 million USDC moved to a Coinbase deposit address in two transactions and approximately 3 million USDC moved to Trading Storage. From the January 2026 advance, the same pattern repeated: 2.5 million USDC moved from f0bf to a different Coinbase deposit address, and Kroll traced most of the remaining 7.5 million USDC from f0bf to Trading Storage. (Hamilton Decl. ¶¶ 18–24.)

Plaintiff's investigation has also observed repeated transfers from the multi-signature wallet that received the Lender's funds to trading related accounts, sometimes several within a minute. (Hamilton Decl. ¶¶ 21–29.) Approximately half of the Lender's funds were used almost immediately to cover trading activity, which is incongruent with the purported separation of the business. (Hamilton Decl. ¶¶ 32, 49.)

### E. Ostium and KKL are Imminently Planning to Dissipate Assets and at Risk of Further Hacks Even if they Don't.

Ostium's August 29, 2026 Recovery Framework Term Sheet did not offer to honor the recalled loans. It offered private lenders [redacted] cash recovery only for a binding election by September 4, 2026, reduced the recovery to [redacted] for an election by September 11, 2026, [redacted] by September 18, 2026, and [redacted] thereafter, and required broad releases. (Zheng Decl. ¶ 25 & Ex. J.) The schedule creates pressure to accept a steep haircut before lenders can test Ostium's financial assertions through discovery.

Alternatively, the same term sheet proposes to retain at least [redacted] million for Foundation/DeltaX working capital and to make approximately [redacted] million in incremental distributions to liquidity providers. It proposes that [redacted] of participating lender claims be exchanged for a new secured facility, with the Foundation as borrower and DeltaX as guarantor, secured by substantially all Foundation and DeltaX assets. The other [redacted] would be exchanged for Ostium Labs equity at a stated [redacted] valuation. *Id.*

Those proposals confirm that Ostium is making present decisions about which constituencies receive cash, which entity retains working capital, which assets will be pledged to a new creditor class, and which lender claims will be exchanged into affiliate equity. They are the operative recovery plan distributed after default and scheduled to begin within days of this filing.

## ARGUMENT

### I. Legal Standard

Federal Rule of Civil Procedure 64 makes New York attachment remedies available in this Court. Fed. R. Civ. P. 64(a). CPLR 7502(c) permits attachment in aid of arbitration when an eventual award may be rendered ineffectual without provisional relief. N.Y. C.P.L.R. § 7502(c); *Iraq Telecom*, 43 F.4th at 269.

Article 62 supplies the attachment grounds, elements, and procedures. The applicant must establish a ground under CPLR 6201, a cause of action, probable success on the merits, and an amount demanded that exceeds all counterclaims known to the applicant. N.Y. C.P.L.R. §§ 6201, 6212(a). Section 7502(c) adds the requirement that an eventual arbitral award may be rendered ineffectual without attachment. N.Y. C.P.L.R. § 7502(c); *Iraq Telecom*, 43 F.4th at 269–70.

For an attachment in aid of arbitration, probable success is "measured in terms of the likelihood of success in arbitration." *Iraq Telecom*, 43 F.4th at 269–70 (quoting *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000)). Because arbitration permits procedural, legal,

equitable, evidentiary, and remedial flexibility, the Court gives the applicant every legitimate inference from the stated facts. *Id.*; *Haverhill Coke Co. LLC v. Algoma Steel, Inc.*, 2026 WL 2348417, at *5 (S.D.N.Y. Aug. 13, 2026).

CPLR 7502(c) reaches international arbitration. *Matter of Sojitz Corp. v. Prithvi Info. Solutions Ltd.* held that CPLR 7502(c) authorizes pre-award attachment "for security purposes" in an international arbitration and that a debt owed by a New York domiciliary to the foreign respondent may be attached here. 82 A.D.3d 89, 94–98 (1st Dep't 2011). This New York-law, New York-seated arbitration has the added support of direct representations that the relevant accounts were maintained here.

Attachment secures an award without deciding the merits. It preserves property against which a later award may be enforced while the tribunal decides liability and damages. *See Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 310–11 (2010); *Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 221–23 (2d Cir. 2006).

Apart from the attachment, Rule 65 supplies a separate federal standard for the requested temporary restraining order. A plaintiff must establish that it is likely to succeed on the merits, likely to suffer irreparable harm without preliminary relief, that the balance of equities favors relief, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010). The record satisfies each requirement.

## II. ESS Frontier LLC Is Likely to Succeed in Arbitration

The arbitral claim is a straightforward contract claim for 15 million USDC in matured principal. The executed Loan Documents, transfers, partial repayment, signed notice recording the remaining balance, recall, default, and assignment establish the claim.

The signed repayment notice establishes that the remaining 5 million USDC under the second loan continued to be outstanding and subject to the Loan Agreement. (Zheng Decl. ¶ 6 & Ex. D.) The first 10 million USDC remained unpaid, and the Foundation paid nothing after the August 1, 2026 recall deadline. (*Id.* ¶¶ 7–8.) This is an open-and-shut breach of contract.

### A. The Written Loan Documents and Undisputed Performance Establish the Contract Claim

New York contract law requires an agreement, plaintiff's performance, defendant's breach, and damages. The Master Agreement and two Loan Term Sheets are executed writings. They identify the borrower, lender, principal amounts, funding mechanics, repayment provisions, fees, New York law, and New York arbitration. (Zheng Decl. ¶¶ 3–5 & Exs. B–C.)

The Lender fully performed by transferring 20 million USDC in the two agreed advances. The Foundation accepted the transfers. Its later 5 million USDC payment is performance consistent with the Loan Documents and the signed notice's confirmation that the remaining 5 million USDC under the second advance continued to be governed by them. (Zheng Decl. ¶¶ 3–6 & Exs. B–D.)

The breach is equally direct. The Lender exercised the contractual recall right on July 22, 2026. The repayment period expired on August 1, 2026, under the Loan Documents. The August 3, 2026 default notice identified the failure to pay. The Foundation has not returned the 15 million USDC principal. (Zheng Decl. ¶¶ 7–8.) The principal balance follows from the executed documents, transfers, partial repayment, and nonpayment.

The written assignment transfers the loans and associated contractual, arbitral, provisional-remedy, tracing, and enforcement rights. (Zheng Decl. ¶ 2 & Ex. A.) The Master Agreement's arbitration clause travels with the assigned claims, and ESS Frontier LLC is invoking it by commencing the AAA arbitration in New York County. (*Id.* ¶ 26.)

Because the Foundation's breach forced Plaintiff to bring this action, the Agreement makes the Foundation responsible for the resulting fees and costs. Section XII obligates the Borrower to pay "all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs" incurred "in connection with the enforcement" of the Lender's rights. Section XIV independently entitles "the successful or prevailing party" in "any proceeding" brought to enforce the Agreement to "attorneys' fees and other costs incurred in such proceeding." This is that proceeding. The contract, fraud, negligence, and alter-ego issues arise from the Foundation's default and Plaintiff's effort to preserve and recover the same assets. The fee provisions therefore reach all reasonable fees and costs incurred in this action. *See Sage Systems, Inc. v. Liss*, 39 N.Y.3d 27, 33–34 (2022); *Binghamton Precast & Supply v. A. Servidone, Inc./B. Anthony Construction Corp.*, 257 A.D.2d 731, 733 (3d Dep't 1999); *Gerber v. Empire Scale*, 147 A.D.3d 1434, 1436 (4th Dep't 2017). But the arbitration clause reaches only those who agreed to it. Section XXIII makes the Agreement "solely for the benefit of the parties hereto and their respective successors and assigns" and gives "no other Person" any right under it. The Foundation's contract dispute remains in arbitration, but KKL and the other nonsignatories cannot use factual overlap to manufacture consent to arbitrate Plaintiff's claims against them. *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359–62 (2d Cir. 2008). They must face those claims in this Court.

*Iraq Telecom* directs the Court to assess likely arbitral success from the arbitral record and the legitimate factual inferences it supports. 43 F.4th at 269–70. Here, the executed writings and payment record support the full principal claim.

**B. The Foundation's Post-Default Conduct Confirms the Debt**

Ostium's own conduct after default is inconsistent with any contention that the debt was invalid or already satisfied. It issued multiple recovery proposals, culminating in the August 29,

2026 term sheet, that offered lenders partial cash, a new facility, or affiliate equity in exchange for releases. (Zheng Decl. ¶ 25 & Ex. J.) A debtor does not propose percentage recoveries and releases for a debt it believes does not exist.

### C. No Known Counterclaim Reduces the $15 Million Claim

The Foundation has asserted no counterclaim or contractual offset that equals or exceeds the unpaid principal. (Zheng Decl. ¶ 9.) For now, and without waiver of its rights, Plaintiff conservatively seeks $15 million in attachment security and excludes Borrow Fees, Late Fees, interest, arbitral fees, attorneys' fees, costs, and any other relief that may increase the final award.

## III. The Circumstances Satisfy CPLR 6201(1) and 6201(3)'s Attachment Grounds

The CPLR 6201(1) statutory provision authorizes attachment when the defendant is a foreign corporation not qualified to do business in New York and the action seeks a money judgment. The Foundation purports to be a Cayman foundation company. The arbitration seeks payment of at least 15 million USDC.[3]

CPLR 6201(3) is independently satisfied by facts showing both intent and actual or imminent dispositions. After the 15 million-USDC debt matured and remained unpaid, Defendants circulated a dated plan to distribute approximately [redacted] million to liquidity providers, retain at least [redacted] million for Foundation/DeltaX working capital, and pledge substantially all Foundation and DeltaX assets to a new secured facility. (Zheng Decl. ¶ 25 & Ex. J.) KKL's contemporaneous messages describe active cross-entity liquidity migration and commingling among the Foundation, Labs, and the hedging entity, while Defendants have obfuscated the institutions, accounts, current balances, and transfer histories of those entities. (*Id.*

[3] *Sojitz* confirms that this foreign-corporation ground supports pre-award attachment in aid of international arbitration. 82 A.D.3d at 91, 96–98. *Haverhill* applied that ground on materially identical facts, confirming an ex parte attachment in aid of arbitration where the respondent was incorporated abroad and unregistered in New York. *Haverhill Coke Co. v. Algoma Steel, Inc.*, 2026 WL 2348417, at *5 (S.D.N.Y. Aug. 13, 2026).

¶¶ 16, 23–24 & Ex. E.) There is no explanation other than that the Alter Ego Defendants' intent is to frustrate enforcement of the matured claim.

Odd withdrawals, timing, evasive explanations, and inability to account for funds supply evidence of intent necessary to satisfy 6201(3). *Pantheon Properties, Inc. v. Houston*, 2022 WL 785168, at *3–4 (S.D.N.Y. Mar. 14, 2022). Ostium's dated written plan, its own entity statements and liquidity messages, missing transaction data, and unpaid matured debt show that the Alter Ego Defendants intend to frustrate Plaintiff's recovery and the arbitration award.

## IV. Without Attachment, the Record Shows That the Arbitral Award May Be Rendered Ineffectual

The record identifies the concrete collection risk required by *VisionChina Media Inc. v. Shareholder Representative Services, LLC*, 109 A.D.3d 49, 59–62 (1st Dep't 2013) (defendant's "stated or indicated intent to dispose of assets" supports attachment), and Iraq Telecom, 43 F.4th at 270. The Foundation owes 15 million USDC, reports approximately [redacted] million in negative equity, and paid only one quarter of the original advances. Its forecasts combine Foundation and DeltaX liquidity, carry large affiliate balances, and project continuing outflows. (Zheng Decl. ¶¶ 3–9, 19–21 & Exs. B–D, H–I.)

The account structure compounds that risk. The Foundation reports approximately [redacted] million in cash, while DeltaX reports approximately [redacted] million largely in hedging and brokerage positions and DX Group carries offsetting intercompany balances. KKL described migrating liquidity, managing collateral, and fragmentation among the Foundation, Labs, and the hedging entity. (*Id.* ¶¶ 16–22 & Exs. E–I.) Those forms of value can be moved, offset, recharacterized, or pledged before an award enters.

The timing is immediate. Ostium projected approximately [redacted] million in net outflows across the combined forecast categories, then circulated an August 29 term sheet proposing

distributions, retained working capital, and a new first-priority lien over substantially all Foundation and DeltaX assets. (*Id.* ¶¶ 19–20, 25 & Exs. H, J.) Those steps reduce the unencumbered value available for the matured debt. September 4, 2026 is the beginning of the shot clock KKL designed to secrete the funds.

Kroll's tracing confirms that the risk exists in live accounts and control paths. Kroll observed approximately $402.1 million moving from the Lender-funding multisig to Trading Storage and approximately $325 million in the reverse direction, substantial movements between the market-maker address and Vault, and a September 2 snapshot of approximately $11.2 million in the Vault, $5.1 million in Trading Storage, and only $7,228 in the [redacted]. (Hamilton Decl. ¶¶ 35–38.) Overlapping, low-threshold control and rapid digital-asset mobility make a later award vulnerable to the same network. (*Id.* ¶¶ 39–49.)

## V. The Court Should Exercise Its Discretion to Secure a Recovery that Would Otherwise be Compromised

Attachment preserves whatever interest the debtor has so that enforcement is not defeated by the time required to obtain a merits determination. *See, e.g.*, *Capital Ventures*, 443 F.3d at 221–23 (observing circumstances that merit attachment).

Attachment of the unpaid principal as well as additional funds necessary to cover costs, late fees, interest, and other amounts potentially recoverable in the arbitration is within the Court's discretion. The requested attachment is also proportionate to the reported property. The Foundation's own July statement reports approximately [redacted] million in current assets, approximately [redacted] million of which is intercompany receivables. The schedules identify additional cash and brokerage accounts whose ownership and liens require disclosure. A $15 million cap preserves no more than necessary to secure the matured principal and allows Defendants to identify and protect any non-Foundation or superior interest.

The transaction has substantial New York connections. The Loan Documents choose New York law and New York County arbitration. KKL solicited the Lender through Ostium's Williamsburg office and met him there. (Zheng Decl. ¶ 14 & Ex. E.) She also represented that Ostium's bank and trading accounts were maintained in New York. (*Id.* ¶ 11.)

## VI. New York Law Permits Attachment of Foundation Debts and Intangible Property Through the Proper Garnishee

### A. The Identified Accounts and Intercompany Claims Are Proper Subjects of Article 62

CPLR 6202 permits attachment of any debt or property against which a money judgment may be enforced (subject to certain inapplicable exceptions). CPLR 5201 reaches a debt owed to the judgment debtor and property that the debtor could assign or transfer. N.Y. C.P.L.R. §§ 5201, 6202. Bank deposits, brokerage rights, payment obligations, and assignable intercompany receivables can therefore be reached through the institution or obligor that owes the debt or holds the property.

*Hotel 71* explains that assignable or transferable intangible rights constitute property for New York enforcement purposes and that the proper garnishee is the person or entity that owes the debt or possesses the property interest. 14 N.Y.3d at 310–16. *Sojitz* applied that principle before an arbitral award and held that a debt owed by a New York domiciliary to the respondent was attachable in New York. 82 A.D.3d at 96–98.

The existing record identifies several concrete routes to attachable property: Foundation bank deposits; Foundation interests in accounts labeled [redacted] and [redacted]; any Foundation property or debt held in Hedging or brokerage accounts; the Foundation's approximately [redacted] million in intercompany receivables; obligations reflected in DX Group's intercompany accounts; and any debt owed to the Foundation by DeltaX, DX Group, Labs, or another enterprise entity. Under Article 62 the Court fixes the debtor and amount now, verified disclosure identifies the

account holder, obligor, location, and control, and the sheriff serves a supplemental levy on the proper garnishee as each Foundation interest is confirmed.

Plaintiff's investigation, conducted by Kroll, provides additional routes: the multisig that received the Lender's funds, Trading Storage, the Vault, Coinbase deposit addresses, the market-maker address identified in the Vault contract, the [redacted], and the Registry, Dev, Gov, Manager, and Owner control addresses. Those paths and control points permit disclosure of account holders, signers, controllers, custodians, and transfers needed to levy Foundation property and debts. (Hamilton Decl. ¶¶ 15, 18–27, 35-46.)

KKL represented to the Lender that Ostium's bank and trading accounts were maintained in New York. (Zheng Decl. ¶ 11 & Ex. E.) The records identify particular account types and institutions. KKL's messages reinforce traditional finance institutions as part of the network of entities. That evidence supplies a concrete basis to believe New York institutions hold Foundation property or owe debts to the Foundation. CPLR 6219 requires a served garnishee to provide a statement identifying debts owed and property held. CPLR 6220 authorizes disclosure to aid in identifying and administering attached property. N.Y. C.P.L.R. §§ 6219, 6220.

## VII. Expedited Discovery Is Necessary and Narrowly Tailored to Complete the Levy

Rule 26(d)(1) permits early discovery for good cause. *Ayyash v. Bank Al-Madina* asks whether the request is reasonable in light of all the circumstances and authorized expedited discovery to identify New York assets for attachment. 233 F.R.D. 325, 326–27 (S.D.N.Y. 2005). Good cause exists because the information is needed before the announced distributions and lien, and each category tracks an account, wallet, entity, or intercompany balance already identified in Ostium's materials.

Defendants should disclose the legal holder, custodian, account identifier, booking branch, balance, positions, signatories, controllers, liens, and recent transfers for the [redacted], [redacted],

hedging, brokerage, multisignature, Arbitrum, and other identified accounts. For material intercompany receivables and payables, they should identify the obligor, terms, consideration, priority, offsets, security, and transfers since August 1, 2025. That information is ordinarily available in existing statements, ledgers, treasury schedules, wallet records, and agreements.

Rules 26(d)(1) and 34(b)(2)(A) authorize early requests and a shortened response time. Plaintiff also seeks a short Rule 30(b)(6) deposition limited to ownership, control, accounts, intercompany obligations, liens, and transfers, followed by focused Rule 45 subpoenas and supplemental levies directed only to institutions and obligors the verified disclosure identifies. The sequence narrows the burden and protects third parties. If disclosure identifies enough unencumbered Foundation property, broader discovery ends. Property held solely for customers or an affiliate falls outside the order, and any garnishee or claimant may identify a superior lien and seek modification. Deadlines begin only upon service, waiver, or appearance; the order preserves privilege and excludes unrelated customer-level information.

The same order should preserve the records required to complete the levy and adjudicate the claims: account statements, wallet-control and access records, transaction ledgers, intercompany agreements and journals, and communications concerning transfers, liens, restructuring, and the July exploit.

Because all the attachment standards are met and KKL seeks to dissipate the assets as early as September 4, 2026, an attachment is necessary to stop KKL's efforts to render the arbitration judgment ineffectual.

## VIII. Rule 65 Independently Supports a Narrow Restraint Over the Property at Issue

### A. Federal Equity Power Authorizes Preservation of the Assets

Rule 65 authorizes an order preserving property that is the subject of the action when the complaint seeks final equitable relief over that same property. *Leadenhall Capital Partners LLP*

*v. Advantage Capital Holdings, LLC*, 171 F.4th 155, 163–65 (2d Cir. 2026); *Gucci America, Inc. v. Bank of China*, 768 F.3d 122, 131–32 (2d Cir. 2014). The Supreme Court applied that power to preserve funds pending claims for rescission and restitution where insolvency and dissipation threatened effective relief. *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288–90 (1940).

The Complaint seeks avoidance of transfers and a constructive trust, equitable lien, restitution, and accounting over the identifiable loan proceeds, their traceable substitutes, and property transferred through the Ostium enterprise. Compl. ¶¶ 138–54 & Prayer for Relief. The requested restraint preserves precisely that property while the Court adjudicates those claims. Rule 64 independently authorizes attachment securing the Foundation's contract debt. The two remedies work together: attachment secures the arbitral award, and Rule 65 prevents Defendants from dissipating the proceeds and traceable property subject to Plaintiff's equitable claims before the Court can act.

**B. Plaintiff Is Likely to Succeed on Its Fraud Claim**

New York fraud requires a material misrepresentation or omission, knowledge of falsity, intent to induce reliance, justifiable reliance, and injury. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). The record supports each element. Before both advances, KKL personally represented that (a) Ostium had enough capital for the required hedging activity; (b) its strategy was delta-neutral; (c) directional exposure would be hedged off-chain through institutional counterparties; and (d) Plaintiff's capital would be deployed through that off-chain institutional hedging structure, while concealing that a substantial portion would instead be routed to Ostium's Trading Storage and used as Ostium's own liquidity to clear, settle, and cover trades. (Zheng Decl. ¶¶ 10–14 & Ex. E); (Hamilton Decl. ¶¶ 17–32, 49); Compl. ¶¶ 112–23.

KKL's statements about then-existing capacity, counterparties, and risk controls were not speculative. They were designed to induce investors to put capital into her company. The evidence supports falsity and material omission. The supposed independent hedging structure was tied to DeltaX and Ostium insiders; the audits did not cover the off-chain infrastructure invoked as a safeguard; and Kroll traced just over half the loan capital into Trading Storage to cover trading rather than through the represented functional separation. (Zheng Decl. ¶ 13); (Hamilton Decl. ¶¶ 8–11, 17–32, 49); Compl. ¶¶ 113–16.

Knowledge and intent follow from the speaker's role and conduct. KKL co-founded and led the enterprise, was the Foundation's contractual Key Person, solicited both loans, supplied the funding address, and later directed liquidity and collateral communications across the Foundation, Labs, and the hedging entity. (Zheng Decl. ¶¶ 10–16 & Exs. B, E.) Kroll's control analysis identifies common creators, overlapping signers, and low-threshold multisignature control across the core contracts. (Hamilton Decl. ¶¶ 39–49.) That record establishes that KKL knew the ownership and control she concealed while seeking the Lender's money.

The Lender's reliance was reasonable because the concealed information—counterparty ownership, capitalization, wallet control, hedging accounts, and audit scope—was nonpublic and peculiarly within Defendants' knowledge. The Lender did not ignore a disclosed risk; he obtained direct representations from the founder before making fixed-term loans. (Zheng Decl. ¶¶ 10–14.) *DDJ Management, LLC v. Rhone Group L.L.C.*, 15 N.Y.3d 147, 154–55 (2010).

The injury is equally concrete. The Lender advanced 20 million USDC, recovered only 5 million, and assigned the resulting claims after the remaining 15 million matured and went unpa*id.* (Zheng Decl. ¶¶ 2–9.) He also lost the independent-counterparty and segregation protections he

was told stood behind the transaction. On this record, the fraud claim is likely to succeed even apart from the documentary contract claim that independently supports attachment.

**C. The Same Record Supports the Related Negligence, Transfer, Equitable, and Alter-Ego Claims**

The negligent-misrepresentation and negligence claims are also likely to succeed. KKL and Ostium Labs possessed specialized knowledge of the enterprise's ownership, hedging capacity, privileged controls, and audit limits; supplied that information for the known purpose of inducing two loans; and failed to exercise reasonable care in describing and protecting the structure. Compl. ¶¶ 125–36; (Zheng Decl. ¶¶ 10–14); (Hamilton Decl. ¶¶ 8–11.) The exploit, Kroll's tracing, and the exclusion of critical off-chain infrastructure from the reviewed audits establish that Ostium failed to use reasonable care in the safeguards and disclosures used to induce the loans, causing the very loss and exposure those representations concealed.

The transfer, equitable, and alter-ego claims also have record support. The Complaint identifies insider and affiliate transfers, loan proceeds and traceable substitutes, intercompany balances, and property now slated for distribution or encumbrance. Compl. ¶¶ 138–60. The Foundation reports negative equity while liquidity, receivables, and control sit across related entities; Kroll traced rapid transfers and overlapping control; and the term sheet treats Foundation debt, DeltaX assets, and Labs equity as parts of one recovery structure. (Zheng Decl. ¶¶ 16–25 & Exs. E–J); (Hamilton Decl. ¶¶ 17–49.) Those facts support both equitable tracing and the inference that domination was used to place the debt in an undercapitalized borrower while value moved through the common enterprise. See *MAG Portfolio Consult, GmbH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

**D. Dissipation Will Cause Irreparable Harm Before Defendants Can Be Heard**

Ostium has circulated a dated plan for distributions and a first-priority lien—that starts today. The relevant wallets remain active; and the funds can move among wallets, exchanges, custodians, and affiliates in minutes. (Zheng Decl. ¶¶ 19–25 & Exs. H–J); (Hamilton Decl. ¶¶ 35 –49.) Notice without a short restraint would identify the property to be preserved while leaving Defendants free to transfer or encumber it.

This is not merely the prospect of difficulty collecting an ordinary judgment. Dissipation would destroy the identifiable res and the tracing trail on which the pleaded restitution, constructive-trust, equitable-lien, avoidance, and accounting claims depend. Courts may preserve particular property when its disappearance would defeat final equitable relief. Deckert, 311 U.S. at 288–90; *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986). And the Foundation's reported insolvency confirms that damages later may not make Plaintiff whole. See *Brenntag International Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999).

**E. The Equities Overwhelmingly Favor a Short, Asset-Specific Restraint**

ESS faces permanent loss of the property and evidence needed for effective relief. Defendants face only a short restraint, capped at $15 million, limited to specified or traceable property, and subject to immediate notice, an undertaking, protection of customer and superior third-party rights, and prompt modification proceedings. Preserving the status quo for days imposes no legitimate hardship comparable to permitting the announced distributions and lien to extinguish the remedy before the Court can hear opposition.

**F. The Public Interest Strongly Favors Stopping, Investigating, and Remedying This Fraud**

The public interest is especially strong. New York arbitration cannot become an empty exercise, and the nascent crypto industry cannot become a lawless maze of obfuscated entities

through which founders enrich themselves while creditors' property disappears. A court confronting materially similar dissipation evidence held that "a temporary asset freeze will serve the public's interest in stopping, investigating, and remedying frauds." *Legacy Investments Holdings, LLC v. John Does 1–20*, No. 3:25-cv-08800, Dkt. 19 at 6 (N.D. Cal. Oct. 23, 2025).

The same is true here. This order protects customers and superior third parties while preserving the property necessary for adjudication. The public interest strongly favors relief.

## IX. Immediate Post-Entry Notice, a Prompt Return Date, and Security Satisfy Due Process

Plaintiff satisfies Rule 65(b)(1)(A) because immediate and irreparable injury will occur before Defendants can be heard: notice would open the transfer window this application seeks to close. The undersigned counsel certifies under Rule 65(b)(1)(B) that no advance notice of this application has been given or attempted, for the reasons set forth above. The Zheng Declaration supplies the sworn emergency showing and states that no previous application for similar relief has been made, as Local Civil Rule 6.1(d) requires. Plaintiff further commits to transmit the complete application and the entered Order to verified defense counsel, the contractual notice addresses, and the fastest reliable last-used business addresses immediately after the first practicable levy or no later than twenty-four hours after entry, whichever is earlier, and to advise the Court of any response. The need is entry before the announced distributions and the new first-priority lien can impair the property available for levy. (Zheng Decl. ¶¶ 19–25, 27; Hamilton Decl. ¶¶ 35–49.)

The rule is deliberately short. It expires no later than fourteen days after entry unless extended as Rule 65(b)(2) permits. After security is posted, Plaintiff will transmit the complete papers immediately after the first practicable levy or no later than twenty-four hours after entry, whichever is earlier; seek consent to extend the restraint while expedited briefing proceeds; and

submit either a consent order or the parties' positions. If consent is withheld, Plaintiff will seek the earliest practicable return date. Defendants retain the Rule 65(b)(4) right to seek dissolution or modification, and the separate CPLR 6211(b) confirmation deadlines apply.

Discovery will precede any evidentiary request. If opposition creates material factual disputes about account ownership, control, transfer, or dissipation, Plaintiff anticipates requesting a limited evidentiary hearing under Rule 43(c) after expedited discovery.

## CONCLUSION

A fixed $15 million *ex parte* attachment against the Alter Ego Defendants' property subject to New York process is warranted, as is a Temporary Restraining Order on KKL and the Alter Ego Defendants pending an Order to Show Cause regarding a Preliminary Injunction. The situation also calls for targeted discovery identifying the New York accounts, debts, and garnishees; requiring verified disclosure, focused production, and a Rule 30(b)(6) deposition; authorizing focused Rule 45 subpoenas and supplemental levies; directing immediate post-entry service; requiring each served garnishee to provide the CPLR 6219 statement within five days; requiring a confirmation motion within ten days after levy; fixing the undertaking and security; setting expedited briefing and a return date; and, if opposition creates material factual disputes, determining whether a limited Rule 43(c) evidentiary hearing is warranted. The attachment need not include unliquidated fees; ESS separately preserves its contractual claim against the Foundation for enforcement fees and costs under Sections XII and XIV.

Dated: September 4, 2026

Respectfully submitted,

**SHOEMAKER GHISELLI + SCHWARTZ LLC**
By: *[/s/ Adam B. Stern]*
Adam B. Stern
1811 Pearl Street
Boulder, Colorado 80302
Telephone: (303) 923-8672
astern@sgslitigation.com
*Attorneys for Plaintiff*

**BURSHTEYN POLIN LLP**
Michael Burshteyn
Jacob Polin
1212 Broadway Plaza, Suite 2100
Walnut Creek, California 94596
Telephone: (925) 238-3119
mike@burshteynpolin.com
jacob@burshteynpolin.com
*Pro hac vice applications forthcoming*

**THE CRYPTO LAWYERS, PLLC**
Rafael Yakobi
11035 Lavender Hill Drive, Suite 160-220
Las Vegas, Nevada 89135
Telephone: (619) 317-0722
rafael@thecryptolawyers.com
*Pro hac vice application forthcoming*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum contains 7,206 words, excluding the caption, table of contents, table of authorities, signature block, and this certificate.

Dated: September 4, 2026

By: *<u>/s/ Adam B. Stern</u>*
Adam B. Stern