**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESS FRONTIER LLC and MINGHUI ZHENG,<br><br>Plaintiffs,<br><br>-against-<br><br>OSTIUM FOUNDATION; OSTIUM LABS CO.; DELTAX LTD.; DX GROUP LIMITED; KALEDORA KIERNAN-LINN; and JOHN DOE TRANSFEREES 1–10,<br><br>Defendants. | Case No. 1:26-cv-07645-LAK<br><br>PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND FOR OTHER RELIEF AND IN REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR AN ORDER OF ATTACHMENT AND OTHER RELIEF |

## TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 3

ARGUMENT ..... 7

I. THE COURT SHOULD RESTORE AND CONFIRM ATTACHMENT IN AID OF THE NEW YORK ARBITRATION. ..... 7

A. The admitted debt and demonstrated risk to recovery satisfy the attachment requirements. ..... 7

B. The equitable-freeze cases preserve the separate attachment remedy. ..... 9

1) Defendants' attachment cases confirm why security is needed here. ..... 10

2) The Court should restore the disclosure needed to levy the attachment. ..... 12

II. DEFENDANTS' CHAMPERTY OBJECTION DOES NOT REQUIRE RELEASE OF THE PROPERTY. ..... 13

A. The assignment protects the original lender's existing investment. ..... 13

B. Zheng joins in the alternative to preserve the same claims and provisional relief. ..... 16

[redacted] ..... 17

A. Independent evidence supports the requested relief. ..... 18

B. Fraudulent procurement and unconscionability defeat the asserted restriction. ..... 18

[redacted] ..... 20

[redacted] ..... 22

IV. THE RECORD SUPPORTS RESTORING PROPERTY-SPECIFIC EQUITABLE RELIEF. ..... 23

A. The fraud and tracing evidence supports relief over the property at issue. ..... 23

B. The forensic record establishes a present risk to the property. ..... 27

C. Plaintiff had no choice but to seek emergency ex parte relief. ..... 28

V. THE COURT SHOULD PRESERVE THE REQUIRED SECURITY AND REJECT THE UNSUPPORTED BOND DEMAND. ..... 30

CONCLUSION ..... 34

## TABLE OF AUTHORITIES

### Cases

Page(s)

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997)....16

*Alcova Investment LLC v. Lakhmna*,
2026 WL 2607013 (S.D.N.Y. Sep. 3, 2026)....11

*American Optical Co. v. Curtiss*,
56 F.R.D. 26 (S.D.N.Y. 1971)....16, 17

*Ames v. Clifford*,
863 F. Supp. 175 (S.D.N.Y. 1994)....11

*Ayyash v. Bank Al-Madina*,
233 F.R.D. 325 (S.D.N.Y. 2005)....13

*Bakerman v. Sidney Frank Importing Co., Inc.*,
No. 1844-N, slip op. at 40–46 (Del. Ch. Oct. 10, 2006), revised Oct. 16, 2006....18

*Bank of China, N.Y. Branch v. NBM LLC*,
192 F. Supp. 2d 183 (S.D.N.Y. 2002)....22

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*,
98 F.3d 13 (2d Cir. 1996)....24

*Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.à.r.l.*,
790 F.3d 411 (2d Cir. 2015)....14

*Cronk v. State*,
100 Misc. 2d 680 (Ct. Cl. 1979)....19, 20

*Dafeng Hengwei Textile Co. v. Aceco Industrial & Commercial Corp.*,
54 F. Supp. 3d 287 (E.D.N.Y. 2014)....12

*DDJ Management, LLC v. Rhone Group L.L.C.*,
15 N.Y.3d 147 (2010)....24, 26

*Deckert v. Independence Shares Corp.*,
311 U.S. 282, 61 S. Ct. 229 (1940)....24, 27

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*,
68 N.Y.2d 954 (1986)....24

*Erickson v. Kidder Peabody & Co.*,
166 Misc. 2d 1 (Sup. Ct. N.Y. Cnty. 1995)....10, 11, 12

*Fritch v. Bron*,
73 Misc. 3d 860 (Sup. Ct. Suffolk Cnty. 2021)....12

*Fund Liquidation Holdings LLC v. Bank of America Corp.*,
991 F.3d 370 (2d Cir. 2021)....16, 17

*Genius Group Ltd. v. LZG International, Inc.*,
2026 WL 1759164 (S.D.N.Y. June 17, 2026)....9, 24

*Gerova Financial Group, Ltd. v. Reynders, Gray Holdings LLC*,
2012 WL 13398356 (S.D.N.Y. Jan. 12, 2012) ....................10

*GoSmile, Inc. v. Levine*,
81 A.D.3d 77 (1st Dep't 2010) ....................24

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308, 119 S. Ct. 1961 (1999)....................1, 9

*Gucci America, Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014)....................24

*Habitations Ltd., Inc. v. BKL Realty Sales Corp.*,
160 A.D.2d 423 (1st Dep't 1990) ....................7

*Haverhill Coke Co. LLC v. Algoma Steel, Inc.*,
2026 WL 2348417 (S.D.N.Y. Aug. 13, 2026)....................9, 32

*Henry v. Daytop Village, Inc.*,
42 F.3d 89 (2d Cir. 1994) ....................17

*Hotel 71 Mezz Lender LLC v. Falor*,
14 N.Y.3d 303 (2010) ....................12

*HSH Nordbank AG v. UBS AG*,
95 A.D.3d 185 (1st Dep't 2012) ....................26

*IKB International S.A. v. Morgan Stanley*,
225 A.D.3d 542 (1st Dep't 2024) ....................14

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
43 F.4th 263 (2d Cir. 2022) ....................2, 7, 8, 9, 12, 31, 32

*ITC Entertainment, Ltd. v. Nelson Film Partners*,
714 F.2d 217 (2d Cir. 1983)....................8

*Johnson & Johnson v. Fortis Advisors LLC*,
No. 490, 2024 (Del. Jan. 12, 2026) ....................20

*Justinian Capital SPC v. WestLB AG, N.Y. Branch*,
28 N.Y.3d 160 (2016) ....................14, 15

*KDH Consulting Group LLC v. Iterative Capital Management L.P.*,
2020 WL 2554382 (S.D.N.Y. May 20, 2020) ....................31, 32

*KDH Consulting Group LLC v. Iterative Capital Management L.P.*,
2020 WL 6564850 (S.D.N.Y. Nov. 9, 2020)....................34

*Keep on Kicking Music, Ltd. v. Hibbert*,
268 F. Supp. 3d 585 (S.D.N.Y. 2017)....................11

*KiSKA Construction Corp.-USA v. G & G Steel, Inc.*,
No. 04 Civ. 9252 (CSH), 2005 WL 1225944 (S.D.N.Y. May 20, 2005) ....................19

*Klein ex rel. Qlik Technologies, Inc. v. Qlik Technologies, Inc.*,
906 F.3d 215 (2d Cir. 2018)....................16

*Leadenhall Capital Partners LLP v. Advantage Capital Holdings LLC*,
171 F.4th 155 (2d Cir. 2026) ....................1, 9, 23

*Leasing Control Inc. v. 500 Fifth Avenue, Inc.*,
193 A.D.3d 592 (1st Dep't 2021) ....................15

*LG Electronics, Inc. v. InterDigital Communications, Inc.*,
114 A.3d 1246 (Del. 2015) ....................20, 21

*Litwin v. OceanFreight, Inc.*,
865 F. Supp. 2d 385 (S.D.N.Y. 2011)....................13

*MAG Portfolio Consult, GmbH v. Merlin Biomed Group LLC*,
268 F.3d 58 (2d Cir. 2001)....................27

*Manufacturers Hanover Trust Co. v. Yanakas*,
7 F.3d 310 (2d Cir. 1993) ....................26

*Metropolitan Partners Group Admin., LLC v. Nerney*,
2026 NY Slip Op 02340 (1st Dep't Apr. 16, 2026)....................24

*Nokia Corp. v. InterDigital, Inc.*,
645 F.3d 553 (2d Cir. 2011)....................33

*P.T. Bank Central Asia, N.Y. Branch v. ABN AMRO Bank N.V.*,
301 A.D.2d 373 (1st Dep't 2003) ....................26

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
2013 WL 1915330 (S.D.N.Y. May 9, 2013) ....................23

*PDVSA U.S. Litigation Trust v. Lukoil Pan Americas, LLC*,
991 F.3d 1187 (11th Cir. 2021) ....................15

*Phoenix Light SF Ltd. v. U.S. Bank National Ass'n*,
612 F. Supp. 3d 263 (S.D.N.Y. 2020)....................15

*PRL USA Holdings, Inc. v. United States Polo Ass'n*,
520 F.3d 109 (2d Cir. 2008)....................21

*RAA Management, LLC v. Savage Sports Holdings, Inc.*,
45 A.3d 107, 110, 116–18 (Del. 2012) ....................21

*Refac International, Ltd. v. Lotus Development Corp.*,
131 F.R.D. 56 (S.D.N.Y. 1990) ....................16, 17

*Richards v. Mountain Capital Management, L.L.C.*,
2010 WL 2473588 (S.D.N.Y. June 17, 2010) ....................32

*Richbell Information Services, Inc. v. Jupiter Partners L.P.*,
280 A.D.2d 208 (1st Dep't 2001) ....................14, 15

*Ripple Analytics Inc. v. People Center, Inc.*,
153 F.4th 263 (2d Cir. 2025) ....................16

*SEC v. Rogas*,
185 F.4th 360 (2d Cir. 2026) ....................32

*Serio v. Black, Davis & Shue Agency, Inc.*,
2005 WL 3642217 (S.D.N.Y. Dec. 30, 2005) ....................21

*Sojitz Corp. v. Prithvi Information Solutions Ltd.*,
82 A.D.3d 89 (1st Dep't 2011) ....................10, 12

*Sprint Communications Co., L.P. v. APCC Services, Inc.*,
554 U.S. 269, 128 S. Ct. 2531 (2008)....................14

*Syracuse Mountains Corp. v. Petróleos de Venezuela S.A.*,
2024 WL 3637997 (S.D.N.Y. Aug. 1, 2024)....................15

*Trust for Certificate Holders of Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates, Series 1999-C1 v. Love Funding Corp.*,
13 N.Y.3d 190 (2009)....................14

*UMB Bank, N.A. v. Bristol-Myers Squibb Co.*,
2026 WL 2339538 (2d Cir. Aug. 13, 2026)....................17

*Vringo, Inc. v. ZTE Corp.*,
2015 WL 3498634 (S.D.N.Y. June 3, 2015)....................20

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7, 129 S. Ct. 365 (2008)....................28

**Statutes and Rules**

Federal Rule of Civil Procedure 15(a)(1)....................16

Federal Rule of Civil Procedure 17(a)(3)....................16

Federal Rule of Civil Procedure 20(a)(1)....................17

Federal Rule of Civil Procedure 30(b)(6)....................13

Federal Rule of Civil Procedure 45....................13

Federal Rule of Civil Procedure 64....................1, 9

Federal Rule of Civil Procedure 65....................30, 33

Federal Rule of Civil Procedure 8(d)....................17

Federal Rule of Evidence 408....................20, 21

N.Y. C.P.L.R. 6201....................7, 8, 12

N.Y. C.P.L.R. 6214(a)....................12

N.Y. C.P.L.R. 6220....................12

N.Y. C.P.L.R. 7502(c)....................1, 2, 7, 9, 12

N.Y. C.P.L.R. Article 62....................9, 10, 24, 27, 30, 33

N.Y. Judiciary Law § 489....................14

# INTRODUCTION[1]

Plaintiffs request a simple remedy that Defendants' motion largely ignores—attachment of $15 million, the loan principal indisputably owed to Plaintiffs, pending a New York arbitration.[2] Without such relief, Plaintiffs' forthcoming arbitral award will be useless and Defendants will be emboldened to continue defying the terms of Plaintiffs' loan. Plaintiffs have easily satisfied the requirements of CPLR 7502(c), which warrants an immediate attachment order against the debtor Ostium Foundation (the "Foundation") for the $15 million.

[redacted]

- Defendants' own cases hold that statutory attachment is an authorized state law remedy that federal courts can apply through Rule 64, not an impermissible asset freeze. It exists apart from and independent of traditional TRO relief. *See Leadenhall Cap. Partners LLP v. Advantage Capital Holdings LLC*, 171 F.4th 155, 166 (2d Cir. 2026).
- [redacted]

[1] This memorandum opposes Defendants' motion and replies in support of Plaintiff's emergency application, as authorized by the September 12 Order.

[2] As discussed below, out of an abundance of caution, Plaintiff Minghui Zheng ("Zheng")—the sole member and owner of Plaintiff ESS Frontier LLC—has joined the case as a Plaintiff in the alternative to put to bed Defendants' unfounded accusations of champerty.

[redacted]

- Irreparable harm is not a factor under CPLR 7502(c). Plaintiffs only must establish that their arbitral award "may be rendered ineffectual without such provisional relief," a point Plaintiffs overwhelmingly established in their moving papers and to which Defendants have no compelling response.
- Nor is balance of harms a factor. Once the CPLR 7502(c) elements are met, Defendants cannot avoid attachment absent a showing of "extraordinary circumstances," such as the potential failure of a national bank and ensuing crisis for the country of Lebanon. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 269 & 273-76 (2d Cir. 2022). Potential disruption to business operations is not "extraordinary circumstances." It occurs in every case when a borrower defaults and is a risk every borrower assumes when borrowing—especially for short term loans with a fast recall right like this one. Regardless, Defendants can operate without restriction once they have set aside the $15 million, and they have several large venture capital partners who can fund a shortfall if one exists and there is equity value to protect.

Plaintiffs also have established that the attachment order should apply to the non-debtor Defendants to the extent the Foundation lacks $15 million in attachable funds. The evidence shows that Defendants operate as a single enterprise controlled by Defendant Kaledora Kiernan-Linn ("KKL"), and KKL induced Zheng to lend USDC through false assurances of institutional, off-

chain, delta-neutral hedging. If the Foundation cannot alone secure the attachment, this is why. Contrary to KKL's representations, Zheng's advances flowed out of the Foundation to the non-debtor Defendants, where they were put into an off-chain system littered with security deficiencies and used to fund trading and cover losses. Defendants hardly dispute these facts, instead claiming that Zheng failed to negotiate sufficient contractual covenants, which is a red herring. Under New York law, false misrepresentations made to induce a loan are fraud, and commingling assets and "a lack of . . . separation between the Foundation and the operating business" (ECF 11, Hamilton Decl. ¶ 49) trigger liability for alter ego and fraudulent transfers.

A borrower cannot accept loans repayable on ten days' recall, fail to pay, and then refuse to provide provisional security pending arbitration because the borrower desires to gamble the lender's money to fund risky operations and professional services. The record and law support lifting the stay, restoring and confirming the attachment, focused asset disclosure and discovery, and denial of Defendants' unsupported request to multiply the bond.

## BACKGROUND

KKL induced Zheng to make short-term loans through representations about the safety of his funds, the purported unique security of Ostium's platform, and his ability to obtain repayment on ten days' notice. Zheng advanced 10 million USDC, a U.S.-dollar stablecoin, in October 2025 and another 10 million in January 2026. The Master Digital Currency Loan Agreement requires AAA arbitration in New York County and permits recall after the non-callable period. (Zheng Decl. ¶¶ 3–7, 10–15 & Exs. B–C, E.)

Before funding, KKL painted a picture of a delta-neutral strategy in which directional exposure would be hedged off-chain through institutional counterparties. She represented that enterprise funds and bank and trading accounts were maintained in New York. Zheng relied on those assurances when he funded the loans. He understood the counterparties to be independent

of Ostium (and Ostium did not disclose the related-party DeltaX arrangement). Zheng chose to fund Ostium, and not others, because he did not want his loan capital exposed to the smart-contract and custody risks of a public liquidity pool that had felled so many other Decentralized Finance platforms. (Zheng Decl. ¶¶ 10–15 & Ex. E; Supp. Zheng Decl. ¶ 8.)

After KKL and Ostium refused to honor their recall obligations, Zheng hired Kroll to conduct a blockchain tracing investigation. The results are alarming and necessitate emergency relief. Kroll traced the advances on-chain, transaction by transaction. Of the first 10 million USDC, 7 million went to Coinbase and approximately 3 million went to an address identified in Ostium's contracts as Trading Storage. Kroll found that Trading Storage held collateral for trades and covered trading losses. Of the second 10 million, 2.5 million went to Coinbase and the remaining 7.5 million went into Trading Storage. On January 29 alone, Kroll counted 236 transactions; by 8 p.m., the receiving wallet's net balance since funding was zero despite about 1.2 million USDC in additional transfers from the Vault. Transaction logs recorded collateral top-ups. Kroll concluded that just over half of the loan capital was used to cover trading activity and losses. (Hamilton Decl. ¶¶ 18–32, 47, 49.)

Zheng sought an off-chain, institutionally managed, delta-neutral arrangement to protect his capital from smart-contract and custody risks. (Zheng Decl. ¶¶ 10–13; Supp. Zheng Decl. ¶ 8.) Three purported multisignature wallets governed privileged functions across the platform. A multisignature wallet requires a specified number of authorized signing addresses to approve a transaction. This makes misappropriation or hack more difficult. Here, Kroll's investigation has found that the multisignature wallets appear to be a sham. The three wallets shared six of eight signers, and two shared a seventh. In reality, rather than requiring independent signers, they actually required only two, three, or four signatures to act depending on the wallet—less than they

made it appear. Working backward through the addresses that first funded those signers, Kroll traced common funding paths to porcellino.eth. The address name resembles Harvard's Porcellian Club. The name suggests that the address was created and controlled by Ostium founders, who met at Harvard. Six shared signers and approval thresholds as low as two placed the platform's privileged functions in one small, overlapping group—controlled by KKL. (Hamilton Decl. ¶¶ 14, 39–48.)

After the Court entered a TRO and Ostium represented that it would abide by it, Kroll continued to investigate. The continued investigation shows continuing fund movements. As of September 13, Kroll identified approximately 11.36 million USDC in the Vault and 3.23 million USDC in Trading Storage. Kroll also identified approximately 287,033 USDC in net Trading Storage outflows on Arbitrum during September 5–13, including transfers to apparent customers and the Vault, and documented continued Trading Storage activity on September 14. These observations reinforce the need to trace, identify, and preserve the property subject to relief. (Second Supp. Hamilton Decl. ¶¶ 4–5, 11–16.)

[redacted]

Six days later, on July 15, an attacker compromised off-chain price-reporting infrastructure, and a privileged signer removed 23,752,746 USDC from the liquidity-provider

vault. KKL acknowledges that the compromised systems lay outside the published smart-contract audits. She also acknowledges the Foundation's ensuing difficulty satisfying creditor obligations. Zheng recalled the remaining loans on July 22 and gave notice of default on August 3. Defendants admit that the recall delivery date passed without payment and that the Foundation owes 15 million USDC plus late and borrow fees. (Zheng Decl. ¶¶ 6–9; KKL Decl. ¶¶ 8–11.)

[redacted]

The Court's September 5 Order granted two remedies. Paragraphs 2–6 and 10–15 authorized attachment of Foundation property and debts subject to New York process, capped at $15 million. Paragraphs 8 and 16–20 preserved identified or traceable property supporting the equitable claims. The Order protected customer property and superior third-party rights, permitted ordinary transactions in non-Covered Property, and authorized account disclosure and focused discovery. On September 12, the Court stayed the September 5 Order pending further order, directed Plaintiff to file its opposition and reply by September 14, and set argument, with possible evidence, for September 17. Plaintiffs seek restoration of the provisional relief on the adversarial record. (Sep. 5 Order ¶¶ 2–27; Sep. 6–7 Endorsements; ECF Nos. 32, 61.) Plaintiffs respectfully submit that their investigator from Kroll would provide helpful testimony to the Court.

Should KKL and Ostium be permitted to maintain the status quo, it is likely that they will dissipate the assets subject to Plaintiffs' anticipated arbitration judgment in pursuit of their high-risk DeFi enterprise.

## ARGUMENT

### I. THE COURT SHOULD RESTORE AND CONFIRM ATTACHMENT IN AID OF THE NEW YORK ARBITRATION.

#### A. The admitted debt and demonstrated risk to recovery satisfy the attachment requirements.

Defendants devote only three pages to opposing Plaintiffs' main request, attachment to secure a forthcoming arbitration award. *See* Defs.' Mot. at 17-19. This is not enough.

Under CPLR 7502(c), the applicant must establish a cause of action, probable success, the applicable statutory ground, a demand exceeding known counterclaims, and at least one of the statutory bases for attachment under CPLR 6201. *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 269-70 (2d Cir. 2022).[3] The loan documents, admitted default, and sworn tracing establish the attachment grounds, probable success, and continuing need for security.

The Foundation received the loans, failed to pay following recall, and admits the balance. Defendants identify no offset extinguishing the principal. (Zheng Decl. ¶¶ 3–9; KKL Decl. ¶ 11; Defs.' Mem. 13.)[4] The Foundation's status alone satisfies CPLR 6201(1): it is a Cayman foundation company, a nondomiciliary, and a foreign corporation not qualified to do business in

---

[3] The fourth element, a basis under CPLR 6201, arguably is not needed but Plaintiffs do not focus on this legal question because they easily satisfy CPLR 6201. *See Habitations Ltd., Inc. v. BKL Realty Sales Corp*., 160 A.D.2d 423, 424 (1st Dep't 1990) ("[T]he standards generally applicable to attachments pursuant to CPLR 6201(3), such as sinister maneuvers or fraudulent conduct, are not required to be shown in an application pursuant to CPLR 7502(c)").

[4] The alleged NDA violation is not a counterclaim. An arbitration to enforce the loan agreement is occurring in New York, while any claim for breach of the NDA would need to be brought in a [redacted]

New York. The September 5 Order made that finding. (Sep. 5 Order ¶ 4.) While not necessary, the present record also establishes the continuing need for security under CPLR 6201(3). The debt is unpaid and Ostium is under obvious financial distress after a major security failure, as it admits. (KKL Decl. ¶ 10 ("Ostium Foundation faced challenges with satisfying all of its creditor obligations").) Benedict Hamilton has documented this through his independent observation of extensive transfers and trading uses. Meanwhile, Defendants demand freedom to continue gambling Plaintiffs' funds on risky trading and professional services.

Defendants misread *Iraq Telecom* as requiring a "stated intent to dispose of" assets. Defs.' Mem. 19. The Second Circuit explains that need may arise from the defendant's financial position, past and present conduct, and payment history. *Iraq Telecom*, 43 F.4th at 269-70. The footnote Defendants cite applies that principle to an apparently insolvent bank that intended to use account funds to process transactions. *Id.* at 271 n.2. That court considered a stated intent to dispose in analyzing financial condition, conduct, and payment history. It did not announce a rule requiring stated intent, and there is no such requirement under CPLR 6201(1) or the ineffectual-award inquiry. *ITC Entertainment, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220, 223 (2d Cir. 1983), likewise distinguishes attachment's security function from jurisdiction and the nondomiciliary ground from a showing of fraudulent concealment.

In any event, Kroll's investigation does show a stated intent to dispose of assets. Ostium and KKL will stop at nothing to keep operating the platform. The problem is that their platform is essentially a gambling enterprise. It risks the funds at issue every single day. Indeed, much of the funds have already been inappropriately used to cover shortfalls caused by Ostium and KKL's high-risk hedging apparatus. Under any standard, consequently, attachment is merited.

*Haverhill Coke Co. LLC v. Algoma Steel, Inc.*, 2026 WL 2348417, at *8 (S.D.N.Y. Aug. 13, 2026), applied *Iraq Telecom* to confirm attachment on concrete financial-strain evidence without finding imminent insolvency. Here, the Foundation admits payment difficulties and default, while the traced transactions and proposed uses of its remaining assets threaten enforcement. Retaining restructuring advisers does not resolve that risk.

CPLR 7502(c) expressly authorizes relief before arbitration begins, subject to commencement within thirty days after relief is granted unless the Court changes that period for good cause. The September 5 Order directed timely commencement of the AAA arbitration. (Sep. 5 Order ¶ 35.) Plaintiffs filed the AAA arbitration today and attach the statement of claim and AAA acknowledgment (Tsan Decl. ¶¶ 2–3 & Exs. A–B).

**B. The equitable-freeze cases preserve the separate attachment remedy.**

Neither case Defendants cite eliminates Rule 64.[5] *Leadenhall* expressly addresses attachment as a distinct state-law remedy and leaves it available on remand because the requisite attachment findings had not been made. 171 F.4th at 166. Here, the September 5 Order made separate attachment findings. Restoration and confirmation is appropriate based on the loan documents, admitted default, and collection risk. (Sep. 5 Order ¶¶ 2–6, 10–15; ECF No. 61.)

Likewise, *Genius Group Ltd. v. LZG International, Inc.*, 2026 WL 1759164, at *2–3 (S.D.N.Y. June 17, 2026), concerned a freeze of unrelated derivative-settlement proceeds to secure a money recovery, without a lien or equitable interest. It did not adjudicate an Article 62 attachment.

---

[5] *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S. Ct. 1961 (1999), and *Leadenhall Capital Partners LLP v. Advantage Capital Holdings LLC*, 171 F.4th 155 (2d Cir. 2026).

Attachment also requires a different property showing from an equitable injunction. It reaches Ostium's own attachable property and debts owing to it, up to the amount needed to secure the award. The property need not be the same USDC Zheng advanced. In *Sojitz Corp. v. Prithvi Information Solutions Ltd.*, 82 A.D.3d 89, 91–94, 96–97 (1st Dep't 2011), the court upheld attachment of a debt owed by a New York customer to secure an arbitration arising from a separate supply transaction. Here, an account balance or receivable available under Article 62 can secure the loan obligation without proof that it contains the original proceeds. Defendants' tracing objection therefore does not answer the request to attach Ostium's property, subject to the statutory ownership, process, and levy requirements.

**1) Defendants' attachment cases confirm why security is needed here.**

*Erickson v. Kidder Peabody & Co.* expressly distinguishes the arbitration standard from a requirement of deceptive maneuvers or fraudulent conduct (even though that also exists here).[6] Relief was denied because a transfer of approximately $580 million in assets produced approximately $670 million in replacement stock, assets remained ample to meet the roughly $50 million claim, and the respondent offered notice if unencumbered assets fell below that amount. Defendants offer no comparable showing that $15 million in reachable property will remain available for the award. Their quotation of *Erickson*'s conclusion omits the facts that made the anticipated award secure there and are lacking here.

*Gerova Financial Group, Ltd. v. Reynders, Gray Holdings LLC*, 2012 WL 13398356, at *5–6 (S.D.N.Y. Jan. 12, 2012), likewise turned on the absence of financial evidence about the actual debtor; stale material concerning an affiliate did not establish the debtor's condition. Here, the Foundation's own default and financial difficulties are admitted, its loan transactions are

[6] 166 Misc. 2d 1, 4–5 (Sup. Ct. N.Y. Cnty. 1995).

traced, and the records identify particular accounts and intercompany obligations for disclosure. (KKL Decl. ¶¶ 9–11; Zheng Decl. ¶¶ 16–24; Hamilton Decl. ¶¶ 18–35.) There is abundant and concrete evidence of Ostium's financial condition.

*Ames v. Clifford*, 863 F. Supp. 175, 177 (S.D.N.Y. 1994), is equally unhelpful: financial position or conduct creating a real enforcement risk is exactly what the record in this action shows. *Keep on Kicking Music, Ltd. v. Hibbert*, 268 F. Supp. 3d 585, 591 (S.D.N.Y. 2017), requires a security need where jurisdiction already exists. Unlike the movants there, who had not established probable success and offered only a generic concern about collection, Plaintiffs establish an admitted debt and a specific financial and forensic record of Defendants' relevant conduct. *Id.* at 591–92.

*Alcova Investment LLC v. Lakhmna*, 2026 WL 2607013, at *2 (S.D.N.Y. Sep. 3, 2026), denied additional attachment because an existing preliminary injunction already protected the project assets and no violation was shown. That court relied on the existing protections deemed adequate and expressly contemplated financial discovery and a renewed application. Defendants here seek to remove the only protections that exist in this case that would make additional attachment unnecessary as in *Alcova*.

[redacted]

[redacted]

The specific transfer and control evidence also supports the Order's separate CPLR 6201(3) finding. (Sep. 5 Order ¶ 5; Zheng Decl. ¶¶ 16–25; Hamilton Decl. ¶¶ 18–49.) *Dafeng Hengwei Textile Co. v. Aceco Industrial & Commercial Corp.*, 54 F. Supp. 3d 287, 294–96, 299–300 (E.D.N.Y. 2014), vacated an attachment after bank records accounted for payments to other debts and showed no persuasive badge of fraudulent disposition. *Fritch v. Bron*, 73 Misc. 3d 860, 862–63 (Sup. Ct. Suffolk Cnty. 2021), rejected information-and-belief concealment allegations and a years-old family-trust transfer; the underlying claims were also defective. Here, the concern rests on identified transactions, overlapping control, and the borrower's actual default and admitted matured debt, and circular movements of remaining funds between the purportedly separate alter ego entities. The September 5 Order independently granted attachment under CPLR 6201(1), and CPLR 7502(c) addresses the demonstrated risk that an award will be defeated.

**2) The Court should restore the disclosure needed to levy the attachment.**

CPLR 6220 authorizes asset disclosure once an order of attachment is granted and before final judgment; CPLR 6214(a) requires identification of the garnishee and property interest. *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 310–16 (2010), addresses attachable intangible rights and the proper garnishee; *Sojitz*, 82 A.D.3d at 94, 96–97, applies attachment to a New York debt securing arbitration. Defendants have no answer to these authorities.

Plaintiffs seek current institutions, public wallets, legal holders, booking locations, controllers, balances, liens, and Foundation receivables now; historical reconstruction can follow on a reasonable schedule. (Sep. 7 Disclosure Response 1; Sep. 8 Joint Letter 1.) That information will also resolve the funding uncertainty Defendants identify. (KKL Decl. ¶ 20.) Objections to assembling a year of transactions do not justify withholding current account and control records.

*Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 402 (S.D.N.Y. 2011), denied broad merger discovery without a sufficient merits or injury showing. Here, the admitted debt and pending hearing require identification of assets subject to attachment. It does not bode well that Defendants seek to remove the only protections that would provide reasonable assurance. *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326–27 (S.D.N.Y. 2005), authorized expedited asset-location discovery on a concrete showing of need under reasonableness and good-cause standards. Plaintiffs make that showing here.

The Court should lift the September 12 stay as to disclosure and require each named Defendant, including KKL, to provide verified identification of each institution, account type and last four digits or public wallet address. This should not be difficult or burdensome. Existing statements and supporting control, lien, and intercompany records should follow. A focused three-hour Rule 30(b)(6) deposition would not be burdensome either, along with targeted Rule 45 process subject to paragraph 25's safeguards. Historical reconstruction can proceed on a reasonable schedule supported by particularized burden objections.

The request preserves privilege, unrelated customer information, superior interests, and proper territorial limits. It seeks the information needed to implement restored attachment as provided by New York law. It is Plaintiffs who would be irreparably harmed without these protections, risking a meaningless award that could have been preserved now.

## II. DEFENDANTS' CHAMPERTY OBJECTION DOES NOT REQUIRE RELEASE OF THE PROPERTY.

### A. The assignment protects the original lender's existing investment.

Zheng made the loans and is ESS's sole member. He transferred the loans and all related rights to his own company for administration and privacy, retaining the contractual right to its net recovery. (Supp. Zheng Decl. ¶¶ 2–4; Zheng Decl. Ex. A § 3.) The assignment transfers the loans

themselves, full legal title, and exclusive enforcement authority. (Zheng Decl. ¶ 2 & Ex. A §§ 1–3.) The transaction places the original lender's existing investment in his wholly owned company; it does not sell that investment to an outside claim purchaser. Remittance of the proceeds does not itself defeat an assignee's standing. *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 285–89, 128 S. Ct. 2531 (2008). *Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.à.r.l.*, 790 F.3d 411, 420 (2d Cir. 2015), distinguishes full legal title from mere collection authority.

Section 489 turns on the purpose of the acquisition: bringing suit must be its primary purpose, rather than merely incidental. *Justinian Capital SPC v. WestLB AG, N.Y. Branch*, 28 N.Y.3d 160, 166–67 (2016). But intent to enforce a debt through litigation does not by itself establish champerty. In *Trust for Certificate Holders of Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates, Series 1999-C1 v. Love Funding Corp.*, 13 N.Y.3d 190, 200 (2009), the Court of Appeals explained: "New York cases agree that if a party acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation. The inquiry into purpose is a factual one." The court upheld an assignment serving the assignee's preexisting proprietary interest. *Id.* at 202. Zheng assigned his own matured loans to his own company to protect his own investment. That purpose is not champerty.

New York distinguishes buying litigation from protecting an existing claim. In *Richbell Information Services, Inc. v. Jupiter Partners L.P.*, 280 A.D.2d 208, 216–19 (1st Dep't 2001), investors established a new nominee to pursue claims protecting financially related interests. The court reversed a champerty dismissal because formation of the nominee for litigation did not eliminate factual questions about the investors' purpose and existing interests. *IKB International S.A. v. Morgan Stanley*, 225 A.D.3d 542, 543 (1st Dep't 2024), later rejected the argument that

*Justinian* invalidates an assignment protecting an assignee's independent ownership and financial interest. Those decisions require examination of the transaction's economic substance and purpose, not a rule that a new company is necessarily a stranger.

ESS was not required to repeat Zheng's demand or commence arbitration within days of the assignment to establish a legitimate purpose. Defs.' Mem. 7, 12. Zheng had already recalled these loans and declared default before assigning them. (Zheng Decl. ¶¶ 7–8.) ESS's purpose must be assessed against that existing investment and the transfer's economic substance, and it does not follow that simply because Zheng used Plaintiff as a vehicle midway through his ongoing collection efforts his existing intentions and course of conduct should be ignored.

Defendants' cases do not justify treating formation dates as a substitute for purpose. *Leasing Control Inc. v. 500 Fifth Avenue, Inc.*, 193 A.D.3d 592, 593 (1st Dep't 2021), involved an assignee with no preexisting relationship to the assignor whose president admitted purchasing the claims to litigate for a share. *Phoenix Light SF Ltd. v. U.S. Bank National Ass'n*, 612 F. Supp. 3d 263, 270–71, 282–86 (S.D.N.Y. 2020), involved reassigned litigation claims after divestment of underlying instruments. ESS instead received the loans and their related rights from its sole owner.

Defendants' quotation from *PDVSA U.S. Litigation Trust v. Lukoil Pan Americas, LLC*, 991 F.3d 1187, 1196 (11th Cir. 2021), omits the immediately following sentence: "And there is no claim that PDVSA—the purported assignor of claims—owns or controls the Litigation Trust or that the Trust is a subsidiary or related entity of PDVSA." The court expressly identified an ownership relationship absent there and present here.

*Syracuse Mountains Corp. v. Petróleos de Venezuela S.A.*, 2024 WL 3637997, at *4–6 (S.D.N.Y. Aug. 1, 2024), rejected six noteholders' privacy and cost explanations for their newly formed assignee at summary judgment. *Richbell*, however, held that formation of a nominee to

acquire claims and pursue litigation did not resolve the investors' purpose and existing indirect interests. 280 A.D.2d at 216–19. Here, Zheng is the original lender, and the transferred assets are his existing loans and related rights. (Supp. Zheng Decl. ¶¶ 2–4; Zheng Decl. Ex. A §§ 1–3.) Defendants seek to ignore this authority and pursue a semantic rather than factual inquiry into purpose. That economic substance, not the incorporation date, governs.

**B. Zheng joins in the alternative to preserve the same claims and provisional relief.**

In any event, Defendants' own authority provides the practical answer. After finding a transfer champertous, *American Optical Co. v. Curtiss*, 56 F.R.D. 26, 32 (S.D.N.Y. 1971), permitted the original owner to join or substitute within ten days. *Refac International, Ltd. v. Lotus Development Corp.*, 131 F.R.D. 56, 58 (S.D.N.Y. 1990), applied the same cure to a champertous assignment. Defendants quote *American Optical*'s invalidity rule but omit its disposition.

Concurrent with this filing, Plaintiffs amend as of course under Rule 15(a)(1). Out of an abundance of caution, the accompanying First Amended Complaint names Zheng as an alternative plaintiff, solely to the extent rights were not effectively assigned, remain with him, or revert upon a determination that the assignment is invalid or ineffective. Plaintiffs maintain the assignment's validity and seek one recovery. His supplemental declaration expressly authorizes continuation, ratifies prosecution to the extent he retains the claims, and consents to addition or substitution. (Supp. Zheng Decl. ¶¶ 5–7.) Those are the acts required for ratification under Rule 17(a)(3). *Ripple Analytics Inc. v. People Center, Inc.*, 153 F.4th 263, 269–70 (2d Cir. 2025). If the transfer was void, the original lender held these same claims when the action began. *Fund Liquidation Holdings LLC v. Bank of America Corp.*, 991 F.3d 370, 386, 391–92 (2d Cir. 2021), rejects an automatic nullity rule in that circumstance. *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20–21 (2d Cir. 1997), addresses a mistake about an assignment's legal effect and a formal amendment that leaves the underlying facts and claims intact. *Klein ex rel. Qlik*

*Technologies, Inc. v. Qlik Technologies, Inc.*, 906 F.3d 215, 226–27 (2d Cir. 2018), rejects a separate honest-mistake prerequisite. Adding the original lender causes no prejudice and rests on the assignment's transfer of full legal title and exclusive enforcement rights.

Rules 8(d)(2) and 8(d)(3) permit alternative pleading. *See, e.g.*, *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir. 1994). Rule 20(a)(1) expressly permits plaintiffs to assert alternative rights to relief arising from the same transactions where common questions of law or fact will arise. *UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, 2026 WL 2339538, at *7–8 (2d Cir. Aug. 13, 2026), recently applied *Fund Liquidation* to a disputed trustee appointment: naming the wrong representative did not defeat jurisdiction where the real parties held cognizable claims when suit began. If the assignment were ineffective, Zheng held these same claims at commencement. His addition changes their representative, not their substance.

Zheng's alternative participation adds the original lender to pursue the same claims and injury. It neither creates a new assignment nor enlarges ESS's substantive rights. It changes no loan, false representation, transfer, missed payment, defendant, or measure of recovery. There will be one recovery for the same injury. *American Optical* and *Refac* answer the champerty-specific cure issue; the general assignment rulings discussed in Defendants' footnote 5 do not displace them. Under any scenario, the situation remains that Defendants owe the debt and must pay.

**III.** [redacted]

[redacted]

**A. Independent evidence supports the requested relief.**

[redacted]

**B. Fraudulent procurement and unconscionability defeat the asserted restriction.**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**C. [redacted]**

[redacted][7] [redacted]

[7] Nor may implied duties reverse that allocation. *Johnson & Johnson v. Fortis Advisors LLC*, No. 490, 2024, slip op. at 42–43, 48 (Del. Jan. 12, 2026) (the implied covenant cannot contradict express terms or supply a term for conduct the contract addresses).

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**D.** [redacted]

[redacted]

[redacted]

## IV. THE RECORD SUPPORTS RESTORING PROPERTY-SPECIFIC EQUITABLE RELIEF.

### A. The fraud and tracing evidence supports relief over the property at issue.

*Leadenhall* requires a substantive equitable claim to the property restrained. 171 F.4th at 163–65. Count V seeks avoidance and recovery of the Foundation's transfers to Labs, DeltaX, DX Group, and other recipients; Count VII seeks a constructive trust, equitable lien, restitution, and accounting over identifiable proceeds, substitutes, and recoverable transfers. (FAC ¶¶ 137–43, 150–54, 202(C), (E)–(F).) These claims seek recovery of transferred property itself, independently of the claim that affiliates are liable for the debt as alter egos. Kroll's investigation further supports the relief. (Hamilton Decl. ¶¶ 18–32.)

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at *3–5 (S.D.N.Y. May 9, 2013), held that avoiding the debtor's transfers supports equitable preservation independently of alter-ego liability. The restraint covered transferred property remaining with the recipient, subject to the ordinary injunction requirements. Plaintiffs seek the same property-specific relief: avoidance and recovery of Foundation transfers, with identified proceeds, substitutes, and recoverable transfers specified in the order. (FAC ¶¶ 139–43, 202(F).)

Fungibility does not erase those limits. Defs.' Mem. 11. The equitable restraint reaches identified or traceable property supporting the pleaded claims; its $15 million cap limits amount

and does not substitute for proof of the property interest. (Sep. 5 Order ¶ 17.) Article 62 separately secures the Foundation's own attachable property.

*Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288–90, 61 S. Ct. 229 (1940), and *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 131–32 (2d Cir. 2014), recognize that preservation function. Unlike the unrelated settlement proceeds in *Genius Group*, the September 5 Order excludes general assets held merely to secure money damages or solely because of affiliation. (Sep. 5 Order ¶¶ 8(a), 16–18.) The Court should apply those limits through property-specific findings and account disclosure, while restoring the independent attachment.

Plaintiffs show a likelihood to prevail on fraud based on Defendants' material misrepresentation, knowledge of falsity, intent to induce reliance, Plaintiffs' justifiable reliance, and injury. *GoSmile, Inc. v. Levine*, 81 A.D.3d 77, 81–82 (1st Dep't 2010); *DDJ Management, LLC v. Rhone Group L.L.C.*, 15 N.Y.3d 147, 154–55 (2010). *GoSmile* sustained fraud based on a false representation of existing compliance. *Metropolitan Partners Group Admin., LLC v. Nerney*, 2026 NY Slip Op 02340, at *2 (1st Dep't Apr. 16, 2026), likewise sustained alternative collateral-fraud and contract claims arising from inventory-value misrepresentations inducing a loan, despite overlapping damages. Here, the representations concerned Ostium's existing strategy, counterparties, custody, and control.

The absence of a use-of-funds covenant does not defeat that inducement claim. Defs.' Mem. 3, 14. In *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986), an oral resale restriction omitted from an integrated agreement could not support a contract claim, yet the Court sustained fraud based on the collateral representation inducing the agreement. *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996), distinguished such collateral inducement from a repackaged promise to perform and

vacated the latter fraud claim. Here, KKL described an institutionally managed, off-chain, delta-neutral operation before funding. Zheng sought to avoid public-pool smart-contract and custody risks, understood the counterparties to be independent, and would not have advanced $20 million on the same terms had the related-party arrangement been disclosed. (Zheng Decl. ¶¶ 10–14.)

The money entered a materially different operation. Kroll traced more than half of the advances into Trading Storage, where funds supplied collateral and covered trading losses. Three multisignature wallets controlled privileged protocol functions, shared six of eight signers, and required only two, three, or four approvals. KKL personally solicited the loans, held the contractual Key Person role, and managed liquidity across the entities. That conduct supports her knowledge of the related-party custody and control arrangement Ostium did not disclose. The actual deployment and concentrated control explain why the undisclosed arrangement mattered to Zheng. (Zheng Decl. ¶¶ 10–16 & Ex. B § VII(e); Hamilton Decl. ¶¶ 18–32, 39–49.)

KKL's Declaration then connects the financial distress to the operational risk left outside the published audits. She admits that an attacker compromised off-chain price-reporting infrastructure and that a privileged signer removed 23,752,746 USDC from the vault on July 15. She acknowledges that the exploited systems were outside the smart-contract audits and that the Foundation thereafter faced difficulty satisfying its creditors. Zheng's recall went unpaid. (KKL Decl. ¶¶ 8–11.) The described loss and ensuing payment failure make the undisclosed custody and control risks concrete. They support the fraud claim and the request to preserve identifiable proceeds and recoverable transfers pending adjudication.

Ostium's audit page says neither Zellic engagement identified critical vulnerabilities and Three Sigma found no critical or high-severity vulnerabilities. The February 2024 Zellic report identifies two critical and three high findings; Three Sigma identifies one critical and two high

findings. These discrepancies bear on the continuing security assurances and Defendants' reliance on the audits. Alongside the pre-funding representations Zheng relied on, this further supports relief. (Second Supp. Hamilton Decl. ¶¶ 21–26; Zheng Decl. ¶¶ 10–14.)

Contractual silence is not a specific disclaimer of reliance. *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315–17 (2d Cir. 1993). The Master Agreement's section XVII is a general integration clause; section V(c) disclaims reliance only on tax or accounting advice, and section IX expressly excepts fraud from the damages limitation. None disclaims reliance on descriptions of hedging, counterparties, or custody. (Zheng Decl. Ex. B §§ V(c), IX, XVII & Ex. C.) Reasonable reliance remains contextual: *DDJ*, 15 N.Y.3d at 154–56, held that lenders obtaining written financial representations need not conduct their own audit as a matter of law. Here, Zheng identifies specific institutional, off-chain assurances and concealed related ownership and control, rather than the public market risks and disclosed conflicts in *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195–99 & 198 n.9 (1st Dep't 2012). (Zheng Decl. ¶¶ 10–13.) Nor does an arm's-length relationship cleanse the transaction: a duty arises where superior knowledge of essential facts not reasonably available to the other party makes nondisclosure inherently unfair. *P.T. Bank Central Asia, N.Y. Branch v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378 (1st Dep't 2003). Zheng identifies the concealed related ownership and control; the inquiry is what pre-lending reasonable diligence could have revealed. (Zheng Decl. ¶¶ 10–13.)

[redacted]

[redacted]

[redacted]

Plaintiffs supply the additional connection between the structure and the alleged wrong: undisclosed related-party custody, actual fund movements, concentrated control, and an unpaid borrower whose value is distributed through the enterprise. KKL's statement that she is not a director of three entities does not rebut her conduct or the control evidence. (KKL Decl. ¶¶ 1, 6–7; Zheng Decl. ¶¶ 10–16.) Nor do Plaintiffs need to establish affiliate liability to preserve the Foundation's own property under Article 62.

**B. The forensic record establishes a present risk to the property.**

The imminent threat is concrete. Kroll documented repeated movement of the advances into trading, collateral top-ups, and low-threshold control over the protocol's privileged functions. The Foundation failed to honor recall after a major compromise, acknowledges creditor-payment difficulties, and seeks to continue deploying assets while opposing the account and ownership disclosures needed to identify reachable property. (Hamilton Decl. ¶¶ 18–32, 39–49; KKL Decl. ¶¶ 8–11, 19–20.) If the identified or recoverable property is dissipated or encumbered, the Court's final equitable relief may become ineffective. *Deckert*, 311 U.S. at 288–90.

The admitted off-chain compromise, continuing transfers, and demonstrated dependence on authorized price sources support restoring protection of identifiable or recoverable property. (Second Supp. Hamilton Decl. ¶¶ 16–18, 29–32; KKL Decl. ¶¶ 8–11.) Smart-contract audits do not test the safety of the off-chain price sources and signing keys the code trusts. The cited exclusions leave that operational risk outside those reviews; the July 15 attack exploited that layer. The evidence explains the continuing risk without claiming a new exploit. (Second Supp. Hamilton Decl. ¶¶ 18, 29–32; KKL Decl. ¶ 8.)

Here, identified transfers and controls, admitted default and financial distress, and proposed uses of remaining property establish the likely harm *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20–22, 129 S. Ct. 365 (2008), requires.

The September 12 Order sets argument on all pending motions for September 17 and permits the Court to take evidence. Plaintiffs respectfully request that in addition to Zheng, Kroll's investigator be permitted to testify. Zheng cannot appear in person this week, but is prepared to travel to New York in October, after October 10, for in-person participation in a preliminary injunction evidentiary proceeding.

**C. Plaintiff had no choice but to seek emergency ex parte relief.**

Willingness to resolve a claim does not make it a settlement ploy, contrary to Ostium's assertions. Of course a defrauded lender remains willing to resolve its claim if the debtor provides relief. Plaintiff had no choice but to turn to this Court to preserve its rights as Defendants frittered away the loan proceeds and refused to honor the bargain and as he uncovered alarming evidence of impropriety on the blockchain. Whether in crypto or traditional financial markets, lenders have a right to enforce the deal for which both sides bargained. (Zheng Decl. ¶¶ 3–16; Hamilton Decl. ¶¶ 18–32; KKL Decl. ¶¶ 8–11.)

The written record refutes Defendants' characterization of the application as a negotiating ploy. Defs.' Mem. 6, 16. Venter supplies his account "in substance," rather than the words counsel used on the call. (Venter Decl. ¶ 13.) What actually occurred was that Plaintiffs' counsel expressed surprise at Defendants' strident tone given they were so open to settling just days earlier and had issued an exploding deadline going into the holiday weekend. In response, one of Defendants' counsel said words to the effect of, 'did I just hear you say you filed this case to gain settlement advantage?' The answer, obviously, was no. The settlement position was also expressly laid out in writing after filing. The investigation supplied the reason for emergency protection. Kroll's declaration reports investigative work through September 2; Plaintiff filed September 4. (Hamilton Decl. ¶ 4 & signature; ECF Nos. 1, 8, 13.) On September 6, Plaintiffs' counsel told Sidley: "When we spoke on Friday, it was not clear whether funds were moving or what the state of any of these other purported disbursements was. Given the extremely obfuscated nature of the alter ego entities and the alarming activity that Kroll has uncovered on the blockchain, we had no choice but to file." Sep. 8 Joint Letter, Ex. C at 6. ESS also explained to the Court that it remained willing to resolve the dispute before and after filing, and supplied the written settlement position to correct Defendants' account. Sep. 8 Joint Letter 1 n.1 & Exs. B–C. Seeking repayment and seeking protection were entirely consistent and have no bearing on whether relief is merited. (Burshteyn Decl. ¶¶ 3–9 & Exs. MB-1–MB-2.)

Defendants' grievance about a potential insolvency proceeding—something they themselves have threatened—is of no import either. Plaintiffs have every right to consider insolvency proceedings and raise concerns about the egregious spending on professional services, using Plaintiffs' own funds, by Defendants. Indeed, Defendants have used it as a cudgel to attempt to coerce Plaintiffs into accepting less than the owed repayment.

Nor does the September 4 call establish that the assets were secure. Venter describes a preliminary conversation and an offer to extend a participation deadline subject to client approval. (Venter Decl. ¶¶ 9–10.) Those representations, by counsel, were belied by the actual blockchain tracing that Kroll uncovered. (It would not be surprising if counsel themselves are unaware of what KKL and Ostium were actually doing on chain.) The original application expressly disclosed that no advance notice was attempted and supplied the reasons why. (ECF No. 13 at 23–24; Sep. 5 Order ¶ 9.)

Defendants' account of September 6 likewise omits the disclosed exchange. Before applying, counsel told Sidley that ESS planned a motion for alternative service by email and blockchain. Sidley responded that it could not confer or engage in discovery before service and confirmation of representation. Sep. 6 Service Letter, Ex. A at 33, 41. The application attached that exchange, acknowledged that the summons had not issued, and expressly requested a September 5 actual-notice discovery trigger. *Id.* at 1–2.

## V. THE COURT SHOULD PRESERVE THE REQUIRED SECURITY AND REJECT THE UNSUPPORTED BOND DEMAND.

Continued operations cannot turn an unpaid recall loan into involuntary trading capital. Defendants' going-concern argument makes asset identification essential: continued outflows threaten recovery unless sufficient reachable property remains preserved.

Plaintiffs are entitled to attachment under Article 62. Defendants should identify and preserve $15 million in Foundation property available for lawful attachment. The requested FRCP 65 restraint separately reaches identified Covered Property. For spending from property within the FRCP 65 restraint, Defendants should identify the proposed source and demonstrate that the identified property remains intact. For attachment, they should identify the property and institutions that will remain available for lawful levy and show that proposed spending leaves the

preserved $15 million intact. The Court can address management or closure of existing customer positions on concrete evidence. It should not grant unrestricted authority to expose protected funds to new trading, collateral calls, reimbursements, or professional charges. (Sep. 5 Order ¶¶ 10–18; Sep. 7 Scope and Bond Resp. 1–3.)

Defendants can identify the affected positions or defined liquidation categories, the transactions needed to reduce or close the exposure, and the property that would fund them. They should distinguish release of existing collateral from commitment of additional Foundation or Covered Property and show the balance and superior claims remaining after the proposed uses. A defined schedule would permit advance approval of necessary closeout transactions while preserving statutory security and the property supporting equitable relief. *KDH Consulting Group LLC v. Iterative Capital Management L.P.*, 2020 WL 2554382, at *9 (S.D.N.Y. May 20, 2020) considered a restraint that prevented investors from exiting volatile positions. It does not establish that every new collateral commitment or professional charge is necessary to close an existing position. *Iraq Telecom* requires assessment of the amount restrained and its operational effects. 43 F.4th at 273–76. The same concrete assessment should govern here.

The public interest also favors preserving the effectiveness of the agreed arbitration and lawful adjudication. The requested relief protects customer property and superior rights, preserves disputed property and statutory security, and permits operational relief supported by actual funding and position-level evidence.

KKL's reference to $24 million in capital announced by Labs in December 2025 supplies a financing history for a different entity and underscores the alter ego issues in this case. (KKL Decl. ¶¶ 4–6, 10–11.) If Defendants contend that Labs' assets, platform revenue, or an intercompany obligation secure repayment, they should identify the Foundation's enforceable

interest, present value, and superior claims. Their corporate-separateness argument makes that accounting essential. *Iraq Telecom*, 43 F.4th at 269–71.

In restoring relief, the Court should require identified funding sources and preserved security in place of blanket expenditure exceptions. Ownership, priority, available balances, and the effects of proposed spending must govern. Attachment secures an eventual award; it does not direct immediate payment or adjudicate competing creditors' priorities. Defendants' assertion that Cayman law prevents preferential repayment identifies no bar to preserving Foundation property under New York attachment procedures. Defs.' Mem. 9. The requested relief retains the September 5 Order's protections for superior third-party rights.

*Haverhill* likewise rejected secured-creditor priorities as a reason to deny attachment; priority could be resolved later in the appropriate forum. 2026 WL 2348417, at *8 n.11. Preservation pending arbitration does not adjudicate ultimate distribution.

*Iraq Telecom* required consideration of intermediate attachment amounts even amid extraordinary concerns about a foreign banking system. 43 F.4th at 273–76. Defendants supply no comparable analysis here. *KDH*, 2020 WL 2554382, at *8-9, involved no proven insolvency, an identified positive redemption value, and a restraint preventing investors from exiting volatile positions. Here, defined property secures an admitted matured loan, with operational relief available if Defendants can prove it up. *KDH* creates no trading-business exemption.

A professional-fee label does not exempt otherwise protected property. A request to use that property should identify the source, amount, necessity, alternative funds, and claimed contractual or superior right so the Court can evaluate it. ESS's prior submission cited *SEC v. Rogas*, 185 F.4th 360, 383–84 (2d Cir. 2026), concerning frozen proceeds placed in an unearned retainer, and *Richards v. Mountain Capital Management, L.L.C.*, 2010 WL 2473588, at *2–3

(S.D.N.Y. June 17, 2010), denying release of frozen assets for legal fees. Those decisions reject an automatic professional-fee exemption for property otherwise subject to restraint. Defendants, after many opportunities, still do not address them.

The Court should also reject the proposed $10 million bond, or $3 million bond under the interim carveouts. The restraint is simply of funds that Plaintiffs lent Defendants and that they are owed repayment. This is no emergency relief on a tort or other claim. Even as to the bond amounts between the attachment and TRO remedy, the Court already acknowledged that the bond for the attachment would be 95% lower. To substantiate their outlandish bond request, Defendants supply neither calculation nor substantiated incremental loss. KKL describes the consequences of stopping all platform activity and generalized uncertainty under a narrower restraint. She identifies no required expenditure that cannot be paid from other property and no causal basis for either bond amount. (KKL Decl. ¶¶ 19–20; Defs.' Mem. 20.) FRCP 65(c) places the amount of security within the Court's discretion. In assessing recovery on an injunction bond, *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 559–60 (2d Cir. 2011), requires substantiated damages proximately caused by the restraint and distinguishes collateral compliance costs from ordinary fees spent contesting it. Defendants supply no comparable factual basis for the much larger prospective security they seek. The September 5 Order set a $5,000 Article 62 undertaking and $100,000 Rule 65 security for separate obligations. (Sep. 5 Order ¶ 12.) If Defendants contend that the actual restraint causes identifiable loss, they should produce the accounts, budgets, and proposed uses that establish it. Unsupported figures do not justify making meaningful provisional relief inaccessible.

The later *KDH* bond decision denied recovery for restructuring, regulatory, partnership, and reputational costs outside compliance with the injunction; potentially compensable document-production costs were neither separated from litigation fees nor quantified. *KDH Consulting*

*Group LLC v. Iterative Capital Management L.P.*, 2020 WL 6564850, at *2 (S.D.N.Y. Nov. 9, 2020). Defendants likewise must connect their requested security to substantiated effects of the proposed restraint and carveouts.

## CONCLUSION

The Court should deny Defendants' relief; lift the September 12 stay; restore and confirm the $15 million attachment against Foundation property and debts subject to New York process; restore targeted asset disclosure and discovery; grant preliminary injunctive relief over the identified property supporting Plaintiffs' equitable claims; replace blanket expenditure exceptions with protections based on identified sources and preserved security; and deny the requested increase in bond. Zheng's alternative participation concerns the same loans, transactions, and collection risk and supplies no basis to deny the provisional relief independently warranted by this record.

Dated: September 14, 2026

Respectfully submitted,

**BURSHTEYN POLIN LLP**
*By: /s/ Michael Burshteyn*
Michael Burshteyn
Jacob Polin
1212 Broadway Plaza, Suite 2100
Walnut Creek, California 94596
Telephone: (925) 238-3119
mike@burshteynpolin.com
jacob@burshteynpolin.com

**THE CRYPTO LAWYERS, PLLC**
Rafael Yakobi
11035 Lavender Hill Drive, Suite 160-220
Las Vegas, Nevada 89135
Telephone: (619) 317-0722
rafael@thecryptolawyers.com

**SHOEMAKER GHISELLI +**
**SCHWARTZ LLC**
Adam B. Stern
1811 Pearl Street
Boulder, Colorado 80302
Telephone: (303) 923-8672
astern@sgslitigation.com

*Attorneys for Plaintiffs ESS Frontier LLC*
*and Minghui Zheng*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum contains 10,269 words, excluding the caption, table of contents, table of authorities, signature blocks, and this certificate. The memorandum of law is 34 pages, excluding the cover and tables, and complies with the 35-page limit in Judge Kaplan's Individual Practices.
Dated: September 14, 2026
*By: /s/ Michael Burshteyn*
Michael Burshteyn